Patricia **BABROCKY**, et al., Plaintiffs-Appellants,

v.

**JEWEL FOOD COMPANY AND RE-TAIL MEATCUTTERS UNION, LOCAL 320,** Defendants-Appellees.

No. 85–1026.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1985.

Decided Sept. 19, 1985.

Rehearing and Rehearing En Banc Denied Dec. 12, 1985.

Before CUMMINGS, Chief Judge, ESCH-BACH, Circuit Judge, and WRIGHT, Senior Circuit Judge.*

CUMMINGS, Chief Judge.

Plaintiffs Patricia Babrocky, Juanita Coffman, Eva Davis, Wilma Keene and Agnes Ross filed a complaint against Jewel Food Company ("Jewel") and Retail Meatcutters Union Local 320 (the "Union"). Five Counts of the complaint brought by the five plaintiffs alleged that Jewel and the Union had discriminated against them on the basis of their sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The other five Counts brought by the plaintiffs alleged that the Union had breached its duty of fair representation under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. For want of merit the district court granted summary judgment to Jewel and the Union with respect to the Title VII claims against both the Union and Jewel having to do with segregated job categories and the Union's unfair representation of plaintiffs in the matter of segregated job categories. It dismissed for lack of subject matter jurisdiction the remaining Title VII claims against both defendants on the ground that they were not included in the EEOC charge. The court also granted summary judgment to the Union on the Section 301 claims as barred by the six-month statute of limitations contained in the National Labor Relations Act (29 U.S.C. § 160(b)). We AFFIRM in part and REVERSE in part.

I

The facts, viewed in the light most favorable to plaintiffs, establish that they, all union members, were employed in Jewel's meat markets in the Northwest Indiana area when Jewel discharged them in December 1980 because of a decline in business. Jewel's meat market employees are

Janet M. Bowermaster, Murphy, McAtte Murphy & Costanza, East Chicago, Ind., for plaintiffs-appellants.

Susan Margaret Vance, Mendel, Lipton & Stevenson Ltd., Edwin H. Benn, Asher, Pavalon, Gittler & Greenfield, Chicago, Ill., for defendants-appellees.

* The Honorable Eugene A. Wright, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, is sitting by designation.

classified in four categories—three categories of meat cutters (head meat cutters, journeymen meat cutters and apprentice meat cutters), and meat wrappers. Being an apprentice meat cutter requires no special skills; an applicant need be only eighteen years of age or older. Under the hiring hall provision of the collective bargaining agreement, in filling vacancies Jewel must first request the Union to refer applicants. Evidently Jewel fills its meat-cutter vacancies through Union referrals (oral argument). In December 1980, all thirty-one of the Jewel meat cutters in the Northwest Indiana area were men while all fifteen of the meat wrappers in the same area were women. The collective bargaining agreement required that each of the retail meat markets be staffed by a minimum of one meat wrapper to every four meat cutters. Prior to this contract's becoming effective (pursuant to a merger between two union locals) in September 1980, the ratio of meat wrappers to cutters had been 1:2. The prior contract governing the union local that merged with Local 320 had not mentioned any employment ratios. In the December 1980 layoffs, only meat wrappers were discharged. No meat cutters were dismissed; in fact, they took over some of the meat-wrapper work.

On December 20, 1980, plaintiffs informally protested their layoffs to the Union in the form of typewritten letters. At the time they met with a union official, Clarence O'Connor, who informed them that they did not have a case and that the Union would not pursue their discharge. He also informed them that the new 1:4 employment ratio permitted plaintiffs to be laid off, although the ratio refers only to minimum staffing levels required for hiring and does not address the appropriateness of Jewel's targeting meat wrappers for layoffs when these minimum levels have been exceeded. Plaintiffs followed up on their informal complaint in the first nine days of January, when they separately filed identically worded charges with the Equal Employment Opportunity Commission ("EEOC") against both Jewel and the Union. Thereafter plaintiffs were informed that they would receive the Union's answer to their charges at the EEOC meeting scheduled for March 1981. The charges against Jewel alleged that Jewel had discriminatorily maintained sex-segregated job classifications and misused an employment ratio of one meat wrapper to four meat cutters to justify the discriminatory layoff of female employees. The charges against the Union alleged that the Union had failed to represent them by agreeing to the 1:4 ratio and by allowing Jewel to maintain sex-segregated job classifications. The Union did not appear at the March EEOC meeting.

The EEOC issued right-to-sue letters to plaintiffs, and they filed their complaint on July 17, 1981. The complaint alleges that Jewel violated Title VII by maintaining sex-segregated job classifications, by failing to recruit, train, transfer, or promote females, by paying plaintiff women less than men who performed comparable work, by discharging women because of their sex, and by instituting a seniority and promotional system to further those practices. The complaint also alleges that both Jewel and the Union violated Title VII by refusing to negotiate a contract that eliminated these disparities. The final allegation is that the Union discriminatorily failed to represent the plaintiffs by allowing Jewel to maintain its discriminatory policies. The Union filed for summary judgment, a motion that Jewel joined. The district court believed that the bulk of the Title VII allegations had not been the subject of the EEOC charge that is a prerequisite to instituting judicial action, and that this incongruency deprived the district court of subject matter jurisdiction. Consequently he dismissed these claims pursuant to FED.R.CIV.P. 12(b)(1), and he granted summary judgment to both defendants on the remainder of the complaint. We have jurisdiction under 28 U.S.C. § 1291, and we consider first the grant of summary judgment to the Union on the Section 301 counts.

## II

█ Plaintiffs admit that the applicable statute of limitations for filing a complaint

on the Section 301 claim against the Union is the six-month limitation in Section 10(b) of the National Labor Relations Act (29 U.S.C. § 160(b)). *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476. They also admit that the statute begins to run when the party " 'discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged [violation].' " *Metz v. Tootsie Roll Industries, Inc.,* 715 F.2d 299, 304 (7th Cir.1983) (quoting *Hungerford v. United States,* 307 F.2d 99, 102 (9th Cir.1962)), certiorari denied, —— U.S. ——, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984). Summary judgment is appropriate if the court can determine that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). At issue in the case at bar is whether summary judgment is appropriate when a deponent contradicts in an affidavit an earlier admission of fact in a deposition that if true would entitle the moving party to a judgment. Summary judgment is intended to avoid a useless trial and is appropriate only where it is quite clear what the truth is. See *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944).

The operative word for determining the correctness of the district court's grant of summary judgment is the word "genuine". Each of the five plaintiffs were deposed, at which time each unequivocally admitted that at the time she filed her EEOC charge against the Union in early January 1981, she did not expect the Union to proceed further in grieving her layoff December 20, 1980. (We have set out the relevant portions of the depositions, relied on by the court below, as an Appendix to this opinion.) The Union relied on these admissions when it moved for summary judgment, whereupon plaintiffs Babrocky, Davis and Ross filed affidavits averring that they were each "confident that [the Union] was processing my grievances along with those of the other grievants between January and March 30, 1981" (Pltfs.' App. C 21, 25,

29). The district court determined that these statements were little more than bald assertions, entirely lacking in any recounting of specific facts such as required by FED.R.CIV.P. 56(e). Because conclusory allegations could not create a conflict with plain admissions in deposition testimony, the district court granted summary judgment.

We agree. Plaintiffs confuse credibility issues with the district court's duty to ignore sham issues in determining the appropriateness of summary judgment. The Eighth Circuit addressed this precise question in *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361 (8th Cir., 1983), where it declared that a "party should not be allowed to create issues of credibility by contradicting his own earlier testimony." *Id.* at 1366. Otherwise, the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut. *Id.* at 1365. That same analysis applies to the instant situation.

Were the conflict at issue between a deposition and an affidavit given by two separate individuals, then summary judgment would be inappropriate because the district court may not weigh conflicting evidence. See, *e.g., Simler v. Conner,* 372 U.S. 221, 222–223, 83 S.Ct. 609, 610–611, 9 L.Ed.2d 691 (1963) (*per curiam* ). The situation is quite different when a plaintiff has directly contradicted her own earlier statements, without explaining the contradiction or attempting to resolve the disparity. For example, in *Kennett-Murray Corp. v. Bone,* 622 F.2d 887 (5th Cir.1980), the Fifth Circuit concluded that summary judgment was inappropriate when a party submitted an affidavit conflicting with that party's earlier deposition testimony, but only because the affidavit explained certain aspects of the deposition by clarifying ambiguities created by confusing questioning of the defendant. It did so by referring in great detail to relevant portions of the deposition. *Id.* at 891 n. 2. See also *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.,* 736 F.2d 656, 658

(11th Cir.1984) (explaining *Kennett-Murray* and harmonizing it with cases affirming grants of summary judgment despite contradictory affidavits and depositions). In contrast, in the case at bar the affidavits are devoid of such explanation. The three plaintiffs who filed affidavits made their assertions without establishing why they were confident the Union was processing their grievances, especially in light of their unequivocal statements in their depositions that by January 9, 1981, they were each convinced that the Union was proceeding no further with regard to their layoffs.[1] Cf. *Posey v. Skyline Corp.*, 702 F.2d 102, 106 (7th Cir.1983) (the mere possibility that a factual dispute may exist is an insufficient basis to avoid summary judgment; affidavit must include specific facts to establish genuine issue of material facts exists), certiorari denied, —— U.S. ——, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Jones v. Howe Military School*, 604 F.Supp. 122, 124 (N.D.Ind.1984) (same).

Union official O'Connor's assurances that the Union would give them their answer to the EEOC charge at the March 1981 EEOC meeting will not carry the weight plaintiffs would give it. Even if the Union intended to appear at the EEOC meeting, its doing so would not establish that the Union was ready to represent the plaintiffs fairly or that it was processing their grievances. O'Connor's statement gives the distinct impression that the Union, if it had appeared, would have done so in an adversary capacity to demonstrate

why the plaintiffs' charges were not well founded. In addition, this statement cannot contradict the Union's firm statements to the five plaintiffs in late December 1980 that it would not be processing their grievances further. Not only should plaintiffs have known that the Union would not be representing them, but by late December they had received actual notice that the Union would not do so.

In the face of this evidence, plaintiff's assurances that they were "confident" that the Union was processing their grievances sound hollow. The absolute consequences of granting summary judgment require that the district court examine the record closely and carefully. Here Judge Kanne ably fulfilled this responsibility. His review of the deposition testimony of all five plaintiffs illustrates the implausibility of the three affidavits. Thus the affidavits raise no genuine issue of material fact. Because all five plaintiffs knew by January 9, 1981, that the Union had refused to grieve their layoffs, their complaint based on this failure filed more than six months later was time-barred and summary judgment for the Union was appropriate.

Although plaintiffs failed on this portion of their appeal, we decline to grant defendant Union's motion for attorney's fees and double costs pursuant to Rule 38 of the Federal Rules of Appellate Procedure. A fee award under Rule 38 requires a finding that the appeal is frivolous and that the case is an appropriate one for the imposi-

---

1. Plaintiffs attempt to place great weight on plaintiff Keene's statement that she (and the other four plaintiffs) filed their EEOC charges against the Union to persuade the Union to "join with them" when they went to the EEOC to try to conciliate their charge with Jewel. This statement, however, is not a statement that the plaintiffs thought that the Union was proceeding with their grievances but that they hoped that their taking such affirmative action would cause the Union to cease discriminating and try to resolve the conflict. In other words, they were hoping that their filing a charge against the Union would have the coercive effect any type of litigation has to some degree or another—persuading the defendant to come to a settlement with the plaintiff in order to avoid the expense of a lawsuit. Such an expectation is

not a belief that the Union *is* processing their grievances, but a belief that it *will* remedy its failure to have processed their grievances as it should have done. Even viewing the evidence in the light most favorable to plaintiffs, as we must do, this one statement by a single plaintiff who, along with the other four plaintiffs, had also unequivocally stated that she believed the Union was going to take no further action in regard to her layoff, is insufficient to create a genuine issue of fact regarding when plaintiffs knew or should have known the Union was not processing their grievances. We note that Keene did not even file an affidavit identifying this potential discrepancy, and none of the other four plaintiffs went so far as to express a hope the Union would alter its conduct to avoid litigation.

tion of sanctions. *Reid v. United States,* 715 F.2d 1148, 1154–1155 (7th Cir.1983). Here the plaintiffs had some reasonable expectation that, on appeal, they would alter the district court's judgment. On this record, we find no evidence that the plaintiffs' affidavits were procured in bad faith.

### III

In addressing plaintiffs' Title VII claims against the Union and Jewel, the district court considered first whether it had subject matter jurisdiction over all of the allegations stated in the complaint. We must consider whether the requirement that the allegations in a complaint be encompassed within the corresponding EEOC charge relates to subject matter jurisdiction or whether it is more in the nature of a condition precedent. We conclude that the latter is the case.

A plaintiff must file a timely charge with the EEOC encompassing the acts complained of as a prerequisite to filing suit in federal court. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). But this requirement of timely filing a charge does not relate to subject matter jurisdiction. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). Timely filing affords the EEOC "an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party [is] permitted to file a lawsuit." *Alexander v. Gardner-Denver Co.,* 415 U.S. at 44, 94 S.Ct. at 1017. Thus the requirement is central to Title VII's statutory scheme. Title VII, however, is a remedial statute, intended to rectify a long history of discrimination. When interpreting the statute, courts should avoid technical constructions. As a result, when appropriate, equitable considerations are available to temper the effect on litigation of the timeliness requirement. *Zipes,* 455 U.S. at 393, 397–398, 102 S.Ct. at 1134–1135.

The failure to file a charge that encompasses all of the allegations in the complaint filed on the basis of the charge is very similar to the timeliness requirement. It also affords the EEOC "the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 929 (11th Cir.1983). Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge. The Supreme Court's directive that the requirement of timeliness is not strictly jurisdictional implies that the requirement of scope should be similarly interpreted.

The requirement of scope also differs substantially from more common elements of subject matter jurisdiction, such as whether a complaint presents a federal question or adequately establishes diversity of citizenship and the requisite amount in controversy. Subject matter jurisdiction generally can be determined facially. In contrast, an inquiry into the scope of the charge always entails an inquiry beyond the face of the complaint into the legal characterizations that surround the barebones of the factual allegations contained in the charge. In addition, such an inquiry may require evidence of the breadth of the EEOC investigation that followed the filing of the charge to determine whether the charge was adequate to support all of the allegations advanced in the complaint. See, *e.g., Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d at 929 ("starting point for determining the permissible scope of the judicial complaint is the EEOC charge and investigation"); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398–399 (3d Cir. 1976), certiorari denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Logan v. General Fireproofing Co.,* 521 F.2d 881, 884 (4th Cir.1971); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466–467 (5th Cir.1970); *Willis v. Chicago Extruded Met-*

*als Co.,* 375 F.Supp. 362, 366 & n. 5 (N.D. Ill.1974).[2]

■ Consequently, the requirement that the scope of the EEOC charge limit the scope of the subsequent complaint is in the nature of a condition precedent with which litigants must comply rather than constituting a component of subject matter jurisdiction. So characterizing the requirement recognizes the similarity between this requirement and the requirement that the EEOC charge be timely filed, and gives full force to the concerns regarding the remedial nature of Title VII and its underlying Congressional policy. See, *e.g., Zipes,* 455 U.S. at 398, 102 S.Ct. at 1135. Therefore, the district court's decision to dismiss those parts of the plaintiffs' Title VII allegations supposedly not included in the EEOC charge should have resulted in partial summary judgment, not dismissal. The point becomes moot in the case at bar, however, because of our ultimate disposition.

■ All claims of discrimination are cognizable that are " 'like or reasonably related to the allegations of the charge and growing out of such allegations.' " *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.,* 538 F.2d 164, 167 (7th Cir. 1976) (*en banc* ) (quoting *Danner v. Phillips Petroleum Co.,* 447 F.2d 159, 162 (5th Cir.1971)), certiorari denied, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). The standard is a liberal one in order to effectuate the remedial purposes of Title VII, which itself depends on lay persons, often unschooled, to enforce its provisions. *Id.* at 167–168. Other circuits are in accord with this analysis. *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 928 (11th Cir. 1983); *Satz v. ITT Financial Corp.,* 619 F.2d 738, 741 (8th Cir.1980); *McBride v. Delta Air Lines, Inc.,* 551 F.2d 113, 115 (6th Cir.1977), vacated on other grounds,

434 U.S. 916, 98 S.Ct. 387, 54 L.Ed.2d 273 (1977); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398–399 (3d Cir.1976), certiorari denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Joslin Dry Goods Co. v. EEOC,* 483 F.2d 178, 184 (10th Cir.1973); *Oubichon v. North American Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir.1973); *Graniteville Co. (Sibley Division) v. EEOC,* 438 F.2d 32, 41–42 (4th Cir.1971); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 462–467 (5th Cir.1970).

*Jenkins* illustrates the liberality with which EEOC charges should be interpreted. The plaintiff there had claimed she was fired because of her Afro hairstyle. She also referred to her place as a leader of the women employees and to the possibility that another employee, a white woman, might also have been denied a promotion because of her association with the plaintiff. Although the plaintiff specifically mentioned only racial discrimination in her charge, we interpreted the narrative of the charge to encompass claims of sex discrimination.

■ Despite our strong language regarding the care with which courts should consider EEOC charges before dismissing a complaint for encompassing claims of discrimination not properly within the scope of the EEOC charge, the district court here summarily dismissed plaintiffs' allegations in their complaint referring to the defendants' discriminatory hiring, firing, recruiting, transfer, and promotion practices as well as the allegations based on unequal pay and the seniority system in place between Jewel and the Union. This dismissal resulted from an inexplicably crabbed interpretation of *Jenkins.* Plaintiffs clearly stated in their EEOC complaints against both Jewel and the Union that the meatcutter and wrapper job classifications were

---

**2.** A limited EEOC investigation is not necessarily fatal to a complaint that contains allegations like or reasonably related to the EEOC charge but that the EEOC, for some reason or another, failed to investigate. Conditioning a plaintiff's right to recover on the omissions of other parties would unduly undermine the remedial purposes of Title VII. In cases in which the EEOC

investigation was overly narrow, the proper inquiry would be into what EEOC investigation could reasonably be expected to grow from the original complaint. *Hicks v. ABT Assocs., Inc.,* 572 F.2d 960, 966 (3d Cir.1978); *Gamble v. Birmingham S.R.R.,* 514 F.2d 678, 688–689 (5th Cir.1975).

sex-segregated. Segregated job classifications cannot be maintained absent discriminatory hiring, recruiting, transfer and promotion practices. Consequently these policies are quite closely linked to a charge of segregating job classifications by sex.

The district court maintained that "[p]laintiffs' EEOC claim does not allege that a rule exists which states that only females may be hired as meat wrappers while only males may be hired as meat cutters" (App. 21). Yet that is precisely what maintaining sex-segregated job categories means. The Supreme Court has recognized that ordinarily "nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1857 n. 20, 52 L.Ed.2d 396 (1977). This pull toward equilibrium renders highly suspect Jewel's maintenance of 100% sex-segregated job classifications. If nothing else, the higher pay associated with meat-cutter work would in the normal course of events attract women as well as men to apply for the work.

This realization points up, in addition, the error in dismissing plaintiffs' allegations concerning unequal pay. The unequal pay between the two categories renders the sex-segregated job classifications most objectionable. Were wrappers paid what meat cutters were, the discrimination would be substantially lessened due to the lack of financial harm to plaintiffs.[3] A complaint about unequal pay is reasonably related to an allegation of sex-segregated job classifications.

Admittedly the EEOC charge does not indicate a failure in the seniority system, because "[t]he underlying legal wrong affecting [plaintiffs] is not the alleged operation of a racially discriminatory seniority system but of a racially discriminatory hiring system." *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 758, 96 S.Ct. 1251, 1261, 47 L.Ed.2d 444 (1976). Thus plaintiffs actually are protesting discriminatory treatment through discriminatory application of hiring and discharging decisions rather than alleging a discriminatory disparate impact resulting from facially neutral seniority provisions. Of course, the complaint could have made this distinction clearer, but that lack of clarity is not fatal. The EEOC charge indicated possible discriminatory misuse of the seniority system, particularly regarding Jewel's and the Union's use of the newly adopted 1:4 hiring ratio to justify laying off only women employees.[4] The pleadings filed in the case make clear that the controversy centers on Jewel's and the Union's possible use of the 1:4 ratio as a pretext. Therefore, the district court's refusal to consider this claim was error. Finally, because the plaintiffs do explicitly refer to their being laid off in the charges, the allegedly discriminatory firing practices were open to judicial inquiry.[5]

In sum, the district court erred by requiring an exact correspondence between the

---

**3.** Plaintiffs would still suffer harm from being denied the opportunity to work in an occupation they might prefer and from being denied the opportunity to work alongside men on an equal basis. We do not mean to belittle such damage. The financial harm the discriminated class bears from segregation, however, is the more tangible evidence of damage that provides the major motivation to statutes such as Title VII.

**4.** Union official O'Conner testified in his deposition that the contract at issue contained no hiring ratio at all. That contention is flatly contradicted by the evidence submitted in this case. See § 1.2(D) of the collective bargaining contract, R. Item 82, Ex. 1 (Union's motion for summary judgment and supporting memorandum of law).

**5.** The lower court believed that the plaintiffs' failure to refer explicitly in their complaint to the 1:4 ratio meant they based none of their claims on that ratio. That contention is error, because the ratio is not an issue itself but rather constitutes evidence of the defendants' discriminatory practices. Plaintiffs did refer in their complaint to their layoffs, thus raising the issue to which the Union's and Jewel's adoption of the ratio is relevant. The ratio could also be relevant to proving the defendants' discriminatory intent in general in their treatment of women.

words of the EEOC charge and the judicial complaint. We decline to "exact such specific articulation and miniscule particularity in the context of Title VII." *Sanchez v. Standard Brands, Inc.*, 431 F.2d at 465. An EEOC complaint contains factual statements only, which may implicate several different types of illegal discrimination. For example, as already shown, an allegation of sex-segregated job classifications necessarily encompasses discrimination in recruiting, hiring, transfer and promotion policies and is reasonably related to an allegation of unequal pay.

Contrary to defendants' argument, *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890 (7th Cir.1981), certiorari denied, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982), does not limit the liberality with which courts should interpret EEOC charges. There we reemphasized that "charges are to be construed with 'utmost liberality.'" *Id.* at 906. Our comment that "some minimum standards of statutory compliance are essential in light of the strong emphasis upon voluntary compliance and conciliation," *id.* at n. 30, referred only to a charging party's ability to file a complaint naming as defendants parties not mentioned in the EEOC charge rather than to the permissibility of including in the complaint those allegations that are like or reasonably related to the EEOC charge but were not themselves explicitly included in the charge. The issue of notice is of particular concern because the EEOC is greatly hampered in its investigatory and conciliatory roles if not all parties are before it, and no party can be sued without proper notice and an opportunity to defend. The instant situation does not implicate the problem of proper notice to all parties. Charges were filed with the EEOC against both defendants, and all of the allegations in the complaint are quite closely related to the factual allegations of the charges. Because "the specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow," *Sanchez v. Standard Brands, Inc.*, 431 F.2d at 465, the complaint in the case at bar is adequate and its scope does not exceed the scope of the predicate EEOC charge.

After dismissing all of plaintiffs' allegations except those explicitly referring to Jewel's maintaining, with the assistance of the Union, sex-segregated job classifications, the trial court considered plaintiffs' remaining claims under the analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This analysis requires the plaintiffs to prove (1) that they are members of the protected class, (2) that they were qualified and applied for meat-cutter positions, (3) that despite their qualifications they were rejected from the positions, and (4) that the positions remained open and the employer continued to seek applicants from persons of the plaintiffs' qualifications. *Id.* at 802, 93 S.Ct. at 1824. The Court noted that courts should apply this framework flexibly, to adapt it to the varying factual situations before them. *Id.* n. 13. The Court has stated that

> [t]he importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.

*International Brotherhood of Teamsters v. United States*, 431 U.S. at 358, 97 S.Ct. at 1866.[6]

---

**6.** Evidence of discriminatory animus is required because this case is premised on a theory of discriminatory treatment, not discriminatory impact. The gravamen of the complaint is not that neutral policies neutrally applied have a discriminatory impact but that the Union and Jewel are subverting neutral policies by applying them in a discriminatory fashion. See *Int'l Bhd. of Teamsters v. United States*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15 (discussing the two different theories). Plaintiffs' use of "pattern-or-practice" language also seems to be misplaced, since such "suits, by their very nature, involve claims of classwide discrimination," B.

■ The court below erred by applying the *McDonnell Douglas* framework too literally when it rejected the balance of plaintiffs' claims because they had never formally applied for meat-cutter positions. Because an employer may create an atmosphere in which employees understand that their applying for certain positions is fruitless, even nonapplicants can in appropriate circumstances qualify for relief under Title VII. "A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection." *Id.* at 365, 97 S.Ct. at 1869. The Court's explicit reference to "the manner in which [the employer] publicizes vacancies," *id.,* as one of the ways in which such implicit messages are communicated, is particularly telling. In the instant situation Jewel evidently filled its meat-cutter positions through the Union's hiring hall. No notices of vacancies were ever posted, nor had the Union ever recommended any of its women members for these positions. Consequently the plaintiffs were never informed of the vacancies for which they could apply. Therefore, the district court's reliance on the plaintiffs' admissions that they had never applied for meat-cutter positions was misguided.

■ Equally misguided was the district judge's dismissal of the plaintiffs' statistical evidence. The Supreme Court has explicitly adopted the use of statistics to establish a prima facie case. *Id.* at 339, 97 S.Ct. at 1856. See also Campbell, *Regression Analysis in Title VII Cases: Minimum Standards, Comparable Worth and Other Issues When Law and Statistics Meet,* 36 Stan.L.Rev. 1299, 1308–1309 (1984) (excellent discussion of use of statistics in general, and regression analysis in particular). Supreme Court acceptance of statistical proof is well established. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979); *Dothard v. Rawlinson,* 433 U.S. 321, 329–331, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *Hazelwood School District v. United States,* 433 U.S. 299, 307–310, 97 S.Ct. 2736, 2741, 2743, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States,* 431 U.S. at 339–340 & n. 20, 97 S.Ct. at 1856 & n. 20; *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620–621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974); *Griggs v. Duke Power Co.,* 401 U.S. 424, 430 & n. 6, 91 S.Ct. 849, 853 & n. 6, 28 L.Ed.2d 158 (1971). See generally B. Schlei & P. Grossman, Employment Discrimination Law 1331–1391 (2d ed. 1983) (discussing use of statistical evidence). This Circuit has long recognized the value of statistical evidence in Title VII cases. See *United States v. United Brotherhood of Carpenters and Joiners of America, Local 169,* 457 F.2d 210, 214 (1972), certiorari denied, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972). Of course, statistical evidence, like any other evidence a plaintiff may introduce, is subject to attack by defendants for its accuracy, reliability, or appropriateness for the question at issue, but that fact does not detract from the usefulness of such evidence. *International Brotherhood of Teamsters v. United States,* 431 U.S. at 340, 97 S.Ct. at 1857.[7]

Schlei & P. Grossman, Employment Discrimination Law 1322 n. 95 (2d ed. 1983), and the five plaintiffs, while attacking policies that would have affected all of Jewel's women employees as a class, have stated only their individual claims, not a class action.

7. Defendants argue that plaintiffs' statistical evidence is worthless because it is not compared to anything. This attack fails because the plaintiffs do compare the percent of women hired as wrappers (100%) to the percent hired as meat cutters (0%), and then contrast that evidence with the percent of men hired as meat wrappers (0%) to the percent hired as meat cutters (100%). Perhaps reference to the workpool from which Jewel hires would be helpful, and it might be necessary were the defendants to introduce evidence giving a legitimate explanation why all the women hired were hired as meat wrappers and none as meat cutters, while all the men hired were hired as meat cutters and none as meat wrappers. Defendants have yet to introduce any such explanatory evidence. The disparity between the two job categories is overwhelming, and as it so stands certainly presents a prima facie case of discriminatory treatment.

The district court's evident belief that a plaintiff could never establish a prima facie case with statistical evidence alone was incorrect.

█ The district court also erroneously believed that the plaintiffs' rejection of apprentice meat-cutter positions with Jewel in October of 1982 proved that instead of applying for meat-cutter positions they had affirmatively rejected those positions. Plaintiffs contend that these offers were settlement offers, and indeed the offers of employment were extended well after the institution of the instant litigation. While the plaintiffs' refusal of the employment offers might limit the amount of the damages they are entitled to recover should they be able to prove liability, see *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), they have no bearing on the merits of the dispute. The trial judge's considering this evidence on the merits was error. The deficiencies in the trial court's analysis of the plaintiffs' Title VII claims against Jewel warrant our reversing his dismissal and summary judgment on those claims.

█ The trial judge predicated his dismissal of the plaintiffs' Title VII claims against the Union on his rejection of their claims against Jewel. Because, as seen, his rejection of the claims against Jewel was erroneous, we must reexamine his rejection of the claims against the Union. Title VII prohibits unions from engaging in discriminatory referral practices and from participating in discriminatory training programs. 42 U.S.C. § 2000e–2(c), (d). Establishing a prima facie Title VII claim against the Union based on a breach of a duty of fair representation requires the plaintiffs to show that (1) Jewel violated the collective bargaining agreement with respect to the plaintiffs, (2) the Union permitted the breach to go unrepaired, thus breaching its own duty of fair representation, and (3) there was some indication that the Union's actions were motivated by discriminatory animus. *Bugg v. International Union of*

*Allied Industrial Workers of America, Local 507,* 674 F.2d 595, 598 n. 5 (7th Cir.1982), certiorari denied, 459 U.S. 805, 103 S.Ct. 29, 74 L.Ed.2d 43 (1982).[8]

█ In the instant case, the plaintiffs allege that the Union joined in Jewel's maintenance of sex-segregated job categories through its operation of its hiring hall and its acquiescence in instituting the 1:4 ratio that Jewel allegedly relied on to justify laying off only women in December 1980. Discriminatory operation of a hiring hall would violate the collective bargaining agreement at issue here, as would a bad faith inclusion of a ratio or a bad faith refusal to protest an improper use of such a ratio by Jewel. See *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976) (discriminatory utilization of collective bargaining remedies constitutes breach of duty by Union); *Mills v. International Brotherhood of Teamsters,* 634 F.2d 282, 284 (5th Cir.1981) (union liable if it refers employees discriminatorily, even if "there was no contractual obligation to hire exclusively on union referral"); *United States v. United Brotherhood of Carpenters and Joiners of America, Local 169,* 457 F.2d at 215, 218–219 (same); *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir.1971) (union's actively recruiting white members for employment vacancies while ignoring minority members is actionable Title VII allegation), certiorari denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *United States v. International Brotherhood of Electrical Workers, Local No. 38,* 428 F.2d 144 (6th Cir.1970) (same), certiorari denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). A union may be liable for not protesting vigorously enough an employer's discriminatory practices. *Foreman v. Wood, Wire and Metal Lathers International Union, Local No. 46,* 557 F.2d 988 (2d Cir.1977); *Wernet v. Amalgamated Meat Cutters & Butchermen, Local 17,* 484 F.2d 403, 404–405 (6th Cir.1973). The union's role as a party to a collective bar-

---

**8.** For a general discussion of the various theories under which unions may bear Title VII liability against wronged employees, see B. Schlei & P. Grossman, *supra,* at 618–637.

gaining agreement may alone be sufficient to impose Title VII liability. *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641, 655 (5th Cir.1974).

As already seen, the maintenance of sex-segregated job classifications implicates Jewel's recruitment, hiring, transfer and promotion policies, while the 1:4 ratio addresses Jewel's discharge policies, so that the Union is fairly implicated in the plaintiffs' Title VII claims if the plaintiffs can prove that the Union's failure to refer qualified women members to Jewel for available meat-cutter positions and its failure to protest the laying off of only women employees was discriminatorily motivated. The total sex segregation of the job classifications in 1980 raises a very strong inference that the Union, as well as Jewel, was discriminatorily motivated, especially because no special qualifications are needed to become apprenticed as a meat cutter. Plaintiffs allege in addition that Jewel originally proposed laying off three women and two men (both apprentice meat cutters), but that the Union persuaded Jewel to lay off five women meat wrappers instead. In addition, plaintiffs testified in their depositions that meat cutters took over doing meat-wrapping work, while any excess work was done by part-time lower-paid help instead of by full-time wrappers. These allegations are sufficient to establish a prima facie case of Title VII discrimination against the Union and render summary judgment inappropriate.

The Union and Jewel may be able to prove that they were not discriminatorily motivated, and to dispel the strong suggestion of discriminatory treatment of women occasioned by the 100% sex-segregation between meat-wrapping work and meat-cutting work. For example, Jewel employee Sam Hill testified in his deposition that Jewel elected to lay off five wrappers, rather than three wrappers and two apprentices as originally contemplated, because apprentices have more flexibility in what the Union contract allows them to do, and Jewel preferred this flexibility. If this desired flexibility is more than a pretext for a discriminatory decision, Jewel and the Un-

ion could evade liability for the plaintiffs' being laid off though they would still have to answer plaintiffs' allegations concerning discriminatory recruiting, hiring, transfer, and promotion practices, and the unequal pay claim. But at this point defendants have not been able to rebut any of plaintiffs' Title VII claims sufficient for summary judgment. Consequently, the lower court's disposition of the Title VII claims is reversed, its judgment for the Union on the Section 301 claims is affirmed, and the case is remanded for further proceedings consistent with this opinion. Circuit Rule 18 will apply.

## APPENDIX

## I. DEPOSITION OF AGNES ROSS

Page 50, line 2.

A I called Clarence one time and asked if the grievances were going to be answered. Now, this was after we filed charges with the E.E.O.C. and he said, you would get your answers at the E.E.O.C. And then we went, and they didn't show up.

Line 18.

Q But it was clear to you following the meeting that the union either could not or would not take steps to resolve your dispute with respect to your lay-offs?

A Right.

Q And following that meeting in the last week of December, you went to Indianapolis and filed a charge with the Equal Employment Opportunity Commission alleging that the union had discriminated against you based on your sex, is that correct?

A Yes.

Q I'm going to show you copy of an E.E.O.C. charge that I have. And I will ask you if that's the charge that you, in fact, filed against the union at the Equal Employment Opportunity Commission? I believe I should say a copy of the charge that you, in fact filed at the Equal Employment Opportunity.

A This is the one, right.

Page 51, line 19.

Q *And you filed that charge because you felt that the union was no longer going to process your grievance with respect to your lay-off of December 1980, is that correct?* (Emphasis added).

A *Right, because that's what they said.* (Emphasis added).

Page 53, line 16.

Q Following your December meeting at the union hall when you learned that the union was not going to go forward with your problem respecting the December 1980 lay-off did you attempt to appeal the decision in any manner to the union's executive board?

A The—no.

Q Did you attempt to appeal the matter in any manner to the international union?

A No, because when—we were at the union meeting at the office there. We discussed with Mr. Kermit Ray and with Clarence O'Conner the ratio. And the fact that there was an inter-office memo sent from Jewel to Mr. Al J. Semass, Mr. Orville Mex, and, of course, the Union a copy of that of which we had an opportunity—or my husband had an opportunity to look at. And that inter-office memo stated there was to be three wrappers laid off and two apprentices. And during that discussion, Clarence and Mr. Kermit Ray both left me with the feeling that my only—my charges had no base other than moral.

Q Did you ask him if there was any appellate route; in other words, did you ask him if there was anything further you could do with respect to your grievance internally within the union?

A I asked for help. And they told me I don't have a case. And I said, then, that I would somehow gather up enough information or whatever it takes, and I would file the case. I would find some answers. And when I do get the answers, I was coming back to the union. And I wanted them to help me, but they didn't.

## II. DEPOSITION OF PATRICIA BABROCKY

Page 31, line 19.

Q Do you recall what you filed on or about December 20th, a few days thereafter? Was it a grievance form?

A No. It was just—I believe it was a letter—in letter form.

Q What did the letter say?

A I don't recall the exact words.

Q Well as nearly as you can remember what did the letter say?

A That I thought I was being discriminated against because all the people that were laid off were females.

Page 32, line 9.

Q What happened after you sent the letter shortly after the 20th?

A I never got a response.

Q Did you attempt to contact the union again?

A Yes. I talked to Mr. O'Conner. And he told me I would get my answer at E.E.O.C. in Indianapolis. And he wasn't there.

Page 32, line 20.

Q When Mr. O'Conner told you that you would get your answer at E.E.O., had you previously filed a claim at E.E.O.?

A Yes. I'm not sure whether we had—yes, I guess we did. Yes.

Q You filed your charge on about January 5th of 1981, didn't you?

Page 33, line 2.

A I believe so.

Q On January 5th you filed a charge against your union, isn't that correct?

A Yes.

Q *So on January 5th 1981, you were apparently satisfied that the union was not going to proceed with your grievance, isn't that correct?* (Emphasis added).

A *Uh-huh.* (Emphasis added).

Line 15.

A *Yes.* (for clarification of the last answer) (Emphasis added).

Line 17.

Q You say you spoke to Mr. O'Conner several weeks after the filing of the E.E.O. charge, is that correct?

Line 24.

Q Do you recall what you said to Mr. O'Conner, and what he said to you?

A Yes I do.

Q Would you tell me what you said to him and what he said to you?

A *I asked him what, if anything, he was going to do for us.* (Emphasis added).

Q *And what was his response?* (Emphasis added).

A *His response was that he would—that there was nothing really to fight for; that nothing was done wrong. And as far as the charges, we would get our answer at the EEOC.* (Emphasis added).

Page 34, line 23.

Q When you learned that the union was not going to proceed any farther with your grievance, did you attempt to appeal that decision to the union executive board?

A No, I don't believe so.

Q Did you attempt to appeal that decision to the international?

A I did not.

## III. DEPOSITION OF EVA DAVIS

Page 33, line 16.

A Now, I did file a grievance with the Union. I don't remember just when it was.

Q But—

A Did we? I don't remember. Yes, we did because—I think I got a letter back from the Union. And what did they say? That the questions would be answered in court, I believe, is what it stated. Something to that effect.

Page 36, line 17.

Q The charge you filed with the Equal Employment Opportunity Commission was filed against the Union, is that correct?

A Correct.

Q So at the date and time on which you filed it, you did not believe that the Union would take any further action with respect to your layoff, is that correct?

A Say—What did you say now?

Page 37, line 1.

Q When you filed the charges with the Equal Opportunity Commission—

A Okay.

Q (continuing)—*at that time did you believe that the Union would take no further action with respect to your layoff?* (Emphasis added).

A *You mean, as far as helping me to get my job back?* (Emphasis added).

Q That's correct.

A No.

Q No, you though [*sic*] the Union—

A *No, I didn't think they would help me.* (Emphasis added).

Q *When you filed the charge, you thought that the Union would not continue to represent you with respect to your layoff?* (Emphasis added).

A *I didn't think so.* (Emphasis added).

Page 37, line 21.

Q Could you tell me, Ms. Davis, at what time you did decide that the Union would not represent you with respect to your lay-off?

A At what time?

Q Did you decide that before you had gone to Indianapolis?

A That they would help me?

Q Yes.

A Sure. I didn't think they would help me. . . .

## IV. DEPOSITION OF WILMA KEENE

Page 28, line 15.

Q I would like you to take a look at the company's Exhibit 1. Is that the E.E.O.C. charge you filed in this case?

A Yes.

Q Would you note the date in the lower left-hand corner?

A 1–5–81.

Page 28, line 25.

Q At the time that you filed that charge, was it your understanding that the Union was not going to do anything further with respect to your layoff?

A No.

Page 29, line 5 through page 30, line 6.

Q Why did you file the charge?

A We thought they would be there at E.E.O.C. with us.

Q But there was no one there from the Union?

A No.

Q And at that point you filed the charge, is that correct?

A We filed the charges earlier. We thought that then the Union would join with us when we went to the E.E.O.C., but they didn't.

Q On or about January 5, 1981, you filed a charge against your Union with tahe [*sic*] Equal Opportunity Commission, isn't that correct?

A Yes.

Q And you alleged in that charge that the Union had discriminated against you because of your sex, is that factually right?

A Yes.

Q *When you filed that charge, was it your understanding that the Union was going to take further action with respect to your layoff in December of 1980?* (Emphasis added).

A *No.* (Emphasis added).

Q *Then you believed that the Union was going to take no further action with respect to your layoff?* (Emphasis added).

A *Right.*

V. DEPOSITION OF JUANITA COFF-MAN

Page 9, line 8.

Q Okay. Now, you filed a grievance?

A Yes.

Q All right. And do you remember approximately when it was that you filed this grievance?

A No, I don't.

Q This was a grievance that you filed along with the other ladies who are in this suit?

A Yes.

Q Okay. On January 9th, I believe it was, 1981, you filed a charge with the Equal Employment Opportunity Commission against the Union. Do you recall that?

A We filed a charge, yes, I know that.

Page 10, line 8.

Q Let me show you what I have marked as Coffman Deposition Exhibit No. 1. That's a copy of a charge filed with the Equal Employment Opportunity Commission. That's the charge that you filed. Its [*sic*] filed against the Union.

A Yes.

Q And that was filed, it says January 11th—January 9th, 1981, is that about the date that you filed it?

A I really don't know. I can't recall.

Q January 9th, 1981, that's the time stamp that appears. Is that the same date? Does that—

A I imagine. I don't recall.

Q Okay. At the time that you filed this charge against the Union, I take it that you were of the opinion that the Union would not be doing anything further to get your job back, isn't that right?

Page 11, line 1.

A They never did get me one back, that's for sure.

Q *All right. Try and answer my question, if you could. When you filed this charge, you were of the opinion that the Union was not going to proceed further to get your job back?* (Emphasis added).

A *Right.* (Emphasis added).