Patricia BABROCKY, Juanita Coffman,
Eva Davis, Wilma Keene and Agnes
Ross, Plaintiffs,

v.

JEWEL FOOD COMPANY and Retail
Meat Cutters Union, Local 320,
Defendants.

No. H 81–380.

United States District Court,
N.D. Indiana,
Hammond Division.

Oct. 14, 1986.

Anthony DeBonis, Jr, Terrance L. Smith, East Chicago, Ind., for plaintiffs.

Stephen Feinberg, Chicago, Ill., Ronald T. Mendes, Melrose Park, Ill., Susan Margaret Vance, Chicago, Ill., Joseph Van Bokkelen, Highland, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

The plaintiffs in this case alleged that the defendants, Jewel Food Company (Jewel) and Retail Meat Cutters Union Local 320 (the Union) had discriminated against them on the basis of their sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII). The plaintiffs had also alleged claims against the Union for breach of its duty of fair representation under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The district court granted summary judgment in favor of defendants on all claims against both defendants. On appeal, the Seventh Circuit Court of Appeals reversed the lower court's ruling on all Title VII claims, affirmed the entry of summary judgment in favor of the Union on plaintiffs' Section 301 claims and remanded the case for further proceedings. *Babrocky v. Jewel Food Co. & Retail Meat Cutters Union, Local 320,* 773 F.2d 857 (7th Cir.1985). The plaintiffs' Title VII claims were tried by the court without a jury in Hammond, Indiana, on July 28, 29 and 30, 1986. The parties have filed briefs on the evidence and law in this case. This memorandum and order contains the findings of fact and conclusions of law thereon pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I.

Jewel is a grocery store chain that has stores in the Northwest area of Indiana and Illinois as well as other States. Each store had a meat department that was referred to as the Meat Market. The employees in the Meat Market were members of the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO. There were four Local unions affiliated with the Amalgamated Meat Cutters Union that represented employees in the retail meat industry in Northern Indiana and Northern Illinois. Local 350 represented employees in Retail Meat Markets in Lake and Porter Counties in Indiana and in Calumet City and Lansing, Illinois. In January 1979, Local 350 merged with Local 320 which represented employees in Retail Meat Markets in Chicago and Cook County, Illinois. Local 320 was the surviving union when the two Locals merged. At the time of the merger between Locals 320 and 350, the Union indicated to its membership that it would try to narrow the gaps between the Collective Bargaining Agreements affecting the two Locals which contract differences included dates of expiration, dates for receiving cost of living increases, wrapper ratios and pricing off premises.

In 1981, Local 320 which then represented the South area of Chicago and Lake and Porter Counties in Indiana merged with Local 546 which represented the Greater Chicagoland area and northern suburbs and Local 612 which represented the Joliet area of Illinois. The purpose of the merger was to secure greater strength at the bargaining table and reduce administrative costs for the Union. Local 546 was the surviving Local union.

The Collective Bargaining Agreements between the Union and the various chain

stores involved were printed in booklet form and distributed to the Union membership. These booklets contained the generic provisions for all chain stores although there were minor differences in the contracts between the individual chain stores that were not incorporated into the booklet. The business agents and other Union officials knew the difference in the contracts and explained those differences when the booklets were handed out to the Union membership. Ratification of the Collective Bargaining Agreements was by vote of the union membership, not just the Union officers or officials.

Under the Collective Bargaining Agreement between Local 350 and various Retail Meat Markets, including the Jewel stores in Northern Indiana, in effect from November 5, 1972 through November 3, 1973, there were four job classifications for employees in the Meat Market—meat wrapper and three categories of meat cutters which included Head Meat Cutter, Journeyman Meat Cutter and Apprentice Meat Cutter.[1] To be an Apprentice Meat Cutter, an individual did not have to possess any special skills, the only requirement being that the individual had to be 16 years of age. After successfully completing a 3 year apprentice program, an Apprentice would become a Journeyman and receive Journeyman wages. The contract provided that Apprentices could be employed at a ratio not exceeding 3 Apprentices for each 7 Journeymen employed by the Employer. The Head Meat Cutter was a Journeyman who was responsible for the efficient management of the Meat Market. The duties of a meat wrapper was limited under the terms of the Collective Bargaining Agreement to "[w]rapping and sealing, scaling, pricing, labeling, displaying and stocking, boarding, boating and traying products provided they do not scrape or trim products, slicing luncheon meats, and slicing cheese if handled in the Meat Department." The contract further provided that there would be no part-time wrapper classification and did not contain any ratio provision of wrappers

to meat cutters. Seniority was determined for employees covered by the Collective Bargaining Agreement by length of continuous service with the employer and the contract specifically provided that the "in-service" date of Apprentice, Journeymen and Head Meat Cutters would not change when an individual progressed from Apprentice to Journeyman or was demoted from Head Meat Cutter to Journeyman. Layoff and recall after a layoff were determined by the seniority date of the employees within a classification. In the meat cutter classification, Apprentices had the lowest seniority. The contract also contained the various wage rates for the classifications. Finally, Section 9.1 of the Collective Bargaining Agreement provided that Local 350, if requested, would furnish men insofar as available to fill open positions.

The Collective Bargaining Agreement between Local 350 and the Retail Meat Markets within its jurisdiction as well as the specific Collective Bargaining Agreement between Local 350 and Jewel for the period covering October 30, 1977 through October 25, 1980, contained basically the same provisions as the earlier Collective Bargaining Agreement described above. The contract again provided that there was no part-time wrapper classification and that Local 350 would, if requested, refer men or people for available work. The contract contained no wrapper to meat cutter ratio. The Collective Bargaining Agreement between Local 350 and Jewel also included a Service Delicatessan Supplement which covered 2 other classifications: full-time deli employees and part-time deli employees. That Supplement also provided that personnel hired in the Meat Markets shall not be assigned to do work in the deli department and that regular Meat Market employees engaged in deli work were to get wages as provided in the Master Collective Bargaining Agreement. Further, the Supplement provided that present Meat Market personnel would not be reclassified or laid off due to hiring deli employees.

1. Other chain stores which have Retail Meat Markets, such as Kroger's and Dominick's, have the same job classifications as Jewel and also follow the same seniority system with respect to layoffs and recalls as Jewel, i.e., seniority by classification.

The Collective Bargaining Agreement between Local 320 and the Retail Meat Markets within its jurisdiction covering the period from September 29, 1974 through September 24, 1977 contained the same basic provisions as the Collective Bargaining Agreements described above with one important additional provision. The Local 320 contract contained a ratio provision for wrappers to meat cutters and specifically provided that "[w]rappers may be employed at a ratio of one wrapper for every four meat cutters (journeymen and apprentices) ..."

After Locals 320 and 350 merged, Local 320 negotiated a Collective Bargaining Agreement governing the Retail Meat Markets in Lake and Porter Counties in Indiana as well as Calumet City and Lansing, Illinois covering the period from October 28, 1979 through April 24, 1982. This Collective Bargaining Agreement contained the same four job classifications as noted in the earlier contracts and also added a Part-time Wrapper classification although it limited that classification to no more than 1 part-time wrapper per store and imposed other limitations on the classification. This Collective Bargaining Agreement did not contain any wrapper to meat cutter ratio unlike the earlier contracts involving Local 320. The contract raised the minimum age for Apprentices to 18 years of age and also contained a new provision at Section 9.8 on hiring practices which provided as follows:

**Section 9.8 Hiring Practice**

When the Employer needs additional employees he shall give the Union equal opportunity with all other sources to provide suitable applicants. Therefore, when openings occur the Employer shall first notify the Union that a vacancy exists. The Union shall refer applicants to the Employer from their records of available and qualified members who are seeking employment. The Employer shall give such applicants equal consideration but shall not be required to hire those persons referred by this process.

Local 320 apparently renegotiated its Collective Bargaining Agreement with the Retail Meat Markets within its jurisdiction in 1980 prior to the expiration of the contract described immediately above. The Union membership was notified of the changes by a Contract Proposal Settlement dated August 28, 1980. The members of Local 320 were also informed that their representatives had been successful in negotiating the same contract for the former members of Local 350 who were employed by Jewel, A & P Tea Company and Eagle as the contract in effect for Local 320 when ratified. The letter then explained that this meant that they would get the same costs of living increase on September 21, 1980 instead of October 8, 1980 and that the expiration dates on the contracts and working conditions would be the same for all Local 320 chain store members.

The evidence in this case contains the booklet form of the Collective Bargaining Agreement between Local 320 and the Retail Meat Markets within its jurisdiction for the period covering September 21, 1980 through July 24, 1982 and its Delicatessan Supplement, as well as the specific Collective Bargaining Agreement between Local 320 and Jewel covering the same time frame. Both of these contracts contain the same basic provisions as the earlier Collective Bargaining Agreements discussed above and the provisions contained in these two contracts themselves are basically the same with one important difference. Both contracts contain the following paragraph:

(D) *Wrappers*

Full-time wrappers may be employed and their duties shall be confined to slicing luncheon meats and sausage; clean-up work in the market; stocking cases; and wrapping, scaling, and pricing. Wrappers may be employed at a ratio of one wrapper for every four meat cutters (journeymen and apprentices) under a formulation of using the total complement of meat cutters in the local union to determine the number of wrappers an Employer may employ. Wrappers shall not use knives, saws, grinders, cube machines or other mechanical equipment used in the preparation or processing of fresh meats or poultry other than as specified above. A quarterly report covering the number of wrappers employed

in relationship to the number of meat cutters (apprentices and journeymen) shall be furnished the Union.

However, the Jewel contract contains an additional paragraph immediately following the above-quoted paragraph which provides as follows:

> The above language regarding Wrapper/Meat Cutter ratios does not apply to employees within the former jurisdiction of Local 350 (namely Lake County, Indiana, Calument City and Lansing, Illinois). These areas, as in the past, may employ wrappers without regard to Wrapper/Meat Cutter ratios.

The Collective Bargaining Agreement between Local 320 and Jewel was signed April 30, 1981. In a letter dated December 21, 1980, Jewel confirmed its understanding with Local 320 that the wrapper to meat cutter ratio contained in the Master Contract did not apply to employees in Lake County, Indiana and Calumet City and Lansing, Illinois, the former jurisdiction of Local 350 and that wrappers "may, as in the past, be employed without regard to wrapper/meat cutter ratios."

The Collective Bargaining Agreement and Delicatessan Supplement between Local 546, after its merger with Locals 320 and 612, and the Retail Meat Markets in its jurisdiction covering the period from July 25, 1982 through July 20, 1985 again contained the same basic provisions as the Collective Bargaining Agreements discussed above including a wrapper to meat cutter ratio of 1 wrapper to 3 meat cutters. However, it too contained an exclusion for employees within the former local 350 jurisdiction as follows:

> It is further understood, and the parties hereby stipulate and agree, that the aforesaid language regarding ratios does not apply to employees within the former jurisdiction of Local 350 namely Lake County, Indiana, Calumet City and Lansing, Illinois. These areas, as in the past, may employ wrappers without regard to Wrapper/Meat Cutter ratios.

This Collective Bargaining Agreement also contained more extensive provisions regarding part-time wrappers including provisions that all part-time wrappers must be laid off before any full-time wrappers and before any Journeymen are laid off.

In the negotiations between Local 546 and the Retail Meat Markets within its jurisdiction with respect to the Collective Bargaining Agreement covering the period from 1985 through July 30, 1988, the employers bargained separately. A letter to all Local 546 members dated December 6, 1985 together with a document attached thereto entitled Jewel/Dominick's Meat Department Settlement Offer Facts notified the union membership of the proposed changes in the new Collective Bargaining Agreement with Jewel and Dominick's. An additional provision was to be added to the contract regarding job transfers which was described as follows:

> Job Transfer: Wrappers desirous of transfer to Apprentice Meat Cutter status shall make their desire known to the Company, in writing, and such employee shall be given equal consideration for such vacancy along with the Apprentice applicants. There shall be no reduction in pay to any wrapper as a result of entering this Apprenticeship program, e.g.. Wrapper's rate of pay shall apply until such time as the Apprentice Meat Cutter rate exceeds the Wrapper rate, at which time the Apprentice Meat Cutter rate shall apply.
>
> The Wrapper commencing the Apprenticeship Program shall have a ninety (90) day trial period. Said trial period shall not jeopardize the employee's former classification or seniority except such wrapper transferred to apprentice classification will have seniority for the purposes of layoff and recall from the date of such transfer.

Eagle, another chain of grocery stores, first proposed this additional provision in its negotiations with Local 546 when it started its negotiations in March 1985 and the Union had no problem with the proposal since it was the union position anyway.

The seniority provisions contained in all of these Collective Bargaining Agreements were the same and the seniority system

was bona fide. Seniority was determined by the time an employee was employed under a particular job classification. Under the Collective Bargaining Agreements, there were three basic job classifications in the Meat Market—head meat cutter, journeyman/apprentice, and wrappers—and those three job classifications were reasonably related to the different job duties of each. Thus, if an employee changed job classifications, i.e. from meat cutter to wrapper, or transferred into a Meat Market classification from some other position, that employee's seniority date for purposes of layoff and recall would be the date that the employee commenced work in the new classification.

The hiring decisions at Jewel were made by the Personnel Manager or Department for Jewel. If a position was open at a Jewel Store, the Personnel Manager would contact job services for referrals and would also get applicants by word of mouth, personal recommendation from an employee of Jewel or walk-ins. One individual who obtained a job with Jewel went through an equal opportunity employment office. Jewel did not post notice of the availability of a position in the Meat Market nor is there any evidence that Jewel notified any of its employees of available positions. An applicant would designate on his or her application form what positions he or she was interested in. After a personal interview, the Personnel Department would select the best suited candidate for a particular position based on the individual's qualifications for the job and interest in the position. The Union played no role in the hiring decisions of Jewel. Although the Collective Bargaining Agreements discussed above contained provisions relating to Union referral of qualified men or persons upon request, Jewel never requested any referral of employees from the Union nor did the Union ever refer, recommend or suggest any individual to Jewel for positions as Wrapper, Apprentice or Journeyman. Prior to December 1980, no females, including the plaintiffs, had applied to be or expressed an interest in being an apprentice or journeyman meat cutter at the Jewel stores in the Northwest area of Indiana or adjoining Illinois area nor had any male applied for or expressed an interest in being a wrapper in the Jewel stores in the Northwest area of Indiana or adjoining Illinois area.

Jewel has a policy of promoting from within its own employees to fill available higher positions and relies on and encourages its Market Managers to suggest and recommend capable people for promotion. The majority of promotions at Jewel are from within its own employees although it does seek outside applicants for positions. Further, if a Jewel employee expresses an interest in other positions, including higher positions, Jewel has tried to place them in the requested position. For example, in 1978 a female wrapper in Chicago told Mr. Richard Durkin, District Manager for Jewel, that she wanted to become an apprentice meat cutter and Jewel complied with the request. Ms. June Goldbery became an Apprentice and was close to completing her apprenticeship when she left the company because she got married and moved to California with her husband. The Personnel Department put an announcement in a store bulletin called the "Flash" about Ms. Goldbery becoming an Apprentice Meat Cutter and the bulletin was distributed to all Jewel stores. Ms. Babrocky testified that she had read the article. Another example of Jewel complying with an employee's request for a different position involved Doris Holmes. Ms. Holmes requested a position as Pier Captain. Jewel told her she would lose her seniority because she would be changing classifications but she said that was o.k. since she could make more money as Pier Captain and she was promoted. Ms. Holmes never asked to be an Apprentice Meat Cutter. Mr. Durkin's employment history with Jewel also reflects Jewel's policy of placing employees in positions they request and promoting from within Jewel. The Union had no role in promotions or changes of classifications or assignment at Jewel.

Jewel would transfer its employees from one store to another store depending upon need and availability of positions. The Union had no role in the transfer of Jewel

employees. If an employee was transferred to a different store but remained in the same classification, such as wrapper or journeyman, their seniority date did not change. However, if the transfer also involved a change in classification, the employee would lose his or her seniority. Prior to 1980, there was a layoff situation in the Chicago Heights area that affected journeymen meat cutters. Those journeymen were transferred to Jewel stores in Indiana where there were positions available. There were no journeymen on layoff when this transfer occurred although there was a layoff that affected journeymen subsequent to that transfer.

The duties of the various employees in the Meat Market at Jewel varied according to the job category or classification they were in. The Market Manager, which was the same as Head Meat Cutter under the Collective Bargaining Agreements, was in charge of the total operation of the Meat Market. The Market Manager was the first line supervisor for the Meat Market, did the scheduling of employees in the Market and reported to the Store Manager. The Assistant Market Manager shared duties with the Market Manager and normally ran the backrooms in the Meat Market where the fresh meat was cut and processed. There was no classification in the Collective Bargaining Agreements that coincided with the Assistant Market Manager position at Jewel. Neither the Market Manager nor the Assistant Market Manager had authority to hire or fire employees in the Meat Market nor did they have anything to do with setting company policy for Jewel.

Journeyman Meat Cutters and Apprentice Meat Cutters could perform any duty within the Meat Market and although they usually worked in the backroom at the Meat Market where the meat was cut and processed, they could also work out front doing wrapper work. At times, customers would place special orders at the front counter and if it required cutting or grinding, only a meat cutter could handle the special order. Two journeymen, Gene Forbes and Carle Forbes, worked out front doing wrapper work a substantial part of

the time but they could and did cut and grind meat for special customer orders as well as cut and process meat in the backroom. An apprentice meat cutter had to successfully complete a 3 year apprenticeship program learning the meat cutting business and would then become a journeyman meat cutter. The first thing an apprentice learned was the different cuts of meat which one could learn by looking at the trays of meat after they were prepared by the butcher and wrapping them or by working alongside a journeyman. Sometimes a wrapper would teach apprentices by showing them how to perform wrapper duties which apprentices could then perform because they were permitted to do so under the Collective Bargaining Agreement. For purposes of layoff and recall, all meat cutters were considered one classification because they had the same basic job duties.

The duties of a meat wrapper were limited by the Collective Bargaining Agreements and basically included weighing, scaling, pricing and wrapping meat; putting meat on trays and displaying it; filling the counter and stocking cases; coding meat to ensure freshness; waiting on customers at the counter; and general cleanup work in the Meat Market. A meat wrapper could also be a pre-pack deli clerk or manager that took care of handling and stocking pre-pack deli items including such items as frozen turkey and canned hams. A meat wrapper was not to do meat cutter work in the backrooms, could not use machines except the wrapping machine and slicing machine for luncheon meats and bacon, and was not to use the grinder or cut meat. A meat wrapper could not fill customer special orders if they required cutting or grinding whereas a journeyman or apprentice could since they could do anything in the Meat Market. Thus, a wrapper had less flexibility in the Meat Market then a meat cutter.

From time to time wrappers would violate the Collective Bargaining Agreements by using machines in the backroom or performing other duties outside of their classification. The Union does not approve of

wrappers doing work outside their classification and if it receives a complaint or observes such an activity, the union investigates the incident and takes up the matter with the company and the employee. Jewel does not approve of wrappers doing work outside of their classification either.

The wages paid employees in the various job classifications was in accordance with the wage structure contained in the Collective Bargaining Agreements and the wage structure was rationally related to the skills and responsibilities associated with the various classifications. Generally, meat wrappers were paid less than journeymen and apprentices because their duties and responsibilities did not include the skill and strain of processing meat associated with meat cutter positions. Further, the wage structure contained in the Collective Bargaining Agreements applicable to Jewel were also applicable in other area grocery store chains.

Jewel had a Patio Shop that was part of its Meat Market in 1967. The Patio Shop sold bulk lunch meats, salads and pre-pack deli items. The Patio Shop was the forerunner to the Sausage Shoppe at Jewel which was also a part of the Meat Market. The Sausage Shoppe sold the same basic items as the former Patio Shop. Other than apprentices and journeymen, those individuals employed in the Sausage Shoppe were apparently classified as deli clerks or employees, a classification apparently not included in the Collective Bargaining Agreement covering the Meat Market at that time. If a deli clerk or deli employee became Manager of a Sausage Shoppe, that individual would receive $7.00 per week extra for that position which required the individual to order, display and maintain the products sold in the Sausage Shoppe and schedule the employees to work. If a journeyman was a Sausage Shoppe Manager, he would receive journeyman's wages which were higher than the wages paid a

deli employee who was a Sausage Shoppe Manager even including the extra $7.00 per week. Because the Sausage Shoppe was a part of the Meat Market, a journeyman or meat wrapper that went from a position on a Sausage Shoppe back to performing market functions did not lose their seniority because they stated in the same classification. However, if a deli clerk in a Sausage Shoppe was transferred to the Meat Market as a wrapper, that employee's seniority would change because the transfer would require a change in job classifications. Sausage Shoppes at Jewel were phased out and by January 1, 1978, there was only one left at Jewel's Store in Merrillville. It too was phased out shortly thereafter. Jewel's Sausage Shoppes were replaced by Chef's Kitchens which apparently were an extended version of the earlier Sausage Shoppes. Chef's Kitchens, however, were not part of the Meat Market. A clerk in a Chef's Kitchen has the same basic duties as a meat wrapper in the Meat Market at Jewel. There are no apprentices or journeymen employed in the Chef's Kitchens because they are not part of the Meat Market.

Before December 1980, all meat wrappers at Jewel Stores in the Northwest Indiana area were female and all apprentices, journeymen, Assistant Market Managers and Market Managers were male. Nor were there any female meat cutters in October 1982 in Indiana. All wrappers were female and all meat cutters were male at those Jewel stores because that is the position they applied for and Jewel placed its employees in the positions they requested. Neither the Union nor Jewel had any policy, contract, reason or impediment against females becoming meat cutters.[2] To become an apprentice, a female only had to request the position but no female employee or applicant ever requested to become an apprentice meat cutter at a Jewel store in the Northwest area of

---

**2.** The plaintiffs maintained that the testimony of William Marsh and David Sykes provided evidence of a Jewel policy with respect to women not becoming meat cutters. As explained later in this opinion, the court does not find Mr. Sykes' conclusion of policy from a mere observation probative evidence of the actual policy of Jewel and this court seriously questions the credibility of Mr. Marsh with respect to his "plan" upon which he bases his assumption of Jewel policy which is also discussed at a later point in this opinion.

Indiana. The Union never received any grievance or complaint from a female Jewel employee that she wanted or was denied an opportunity to transfer to, be promoted to or was unfairly rejected from an apprentice meat cutter position nor did the Union ever receive, prior to December 1980, any complaint or grievance about segregated job categories at Jewel in Northwest Indiana.

In 1980, there were 32 apprentice and journeymen meat cutters employed by Jewel in Northwest Indiana. All of the meat cutters were male and all of the meat wrappers were female. The seniority list for journeymen and apprentices for 1980 reveals that there were 6 individuals in the meat cutter classification of apprentices and journeymen that had seniority dates that indicate that they were hired during the time that plaintiffs were employed by Jewel. Those 6 individuals included William Congious (10–7–68), William Marsh (3–2–70). Gregory Feranec (6–27–78), Ashanti Sabree (5–7–79), John Correa (5–21–79) and Robert Sutter (6–18–79).[3] The Union received the seniority lists from Jewel.

Mr. Richard Durkin, the marketing district manager for Jewel covering the Indiana area in 1980, was responsible for staffing the Meat Market and planning the budget for the Meat Market. In performing his duties, he would monitor the sales in the Meat Market on a weekly basis and would adjust staff according to sales to keep within budget in an effort to operate a cost efficient Meat Market.

In the 5th period of the operating calendar for Jewel which was about June 1980, Mr. Durkin first determined the need for a layoff at Jewel stores in Indiana. He discussed this matter with his superiors at Jewel and the operating staff prepared the figures to support a layoff in Indiana. At that time, there was an 18% to 25% unemployment rate in the area due to a heavy layoff in the steel industry and several hundred employees being unemployed because of a strike at Nipsco. Further, Dominick's, another grocery store chain, opened a new store in the area on Torrence Avenue. Both of these items resulted in a decline in meat business for Jewel stores in the Northwest area of Indiana. Total meat sales had decreased from a positive 7.07 in the first period to a −7.39 in period 8 for Jewel and when the meat sales for the new Jewel Store, #1276 in Crown Point, were removed from the figures, the meat sales dropped to −18.05 in period 8 as compared to the figures for the previous year. Based on these decreased sales figures reflecting a down turn in the meat business for Jewel, Jewel determined that it needed to reduce its payroll expense in order to reduce the budget in relation to the decreased meat sales.[4] Jewel management being Frank Tulley, the Vice President of Meat Operations for Jewel, decided a layoff was necessary and recommended that 3 meat wrappers and two apprentice meat cutters be laid off.

Jewel had a meeting with the Union and presented the Union with the figures to justify the layoff. The Union was satisfied that the layoff was economically justified and although it objected to any layoff, the Union thought that the decision to layoff 3 meat wrappers and 2 apprentice meat cutters was the fairest alternative and agreed to it. The Union did not negotiate with Jewel on the layoff or suggest that any other combination of employees should be laid off to meet the necessary budget reduction.

When the Union representatives went to the individual stores to inform those individuals to be affected by the layoff of

**3.** Another individual, David Sykes, was also employed by Jewel some time during the time plaintiffs were employed by Jewel. Apparently, Mr. Sykes was hired as a wrapper but because he had requested a meat cutter position on his application, his job classification was changed to Apprentice his first day. His name does not appear on either the seniority lists of Apprentices and journeyman or the seniority list of wrappers apparently because he had become a Head Meat Cutter by the time the seniority lists were prepared.

**4.** Two witnesses for plaintiffs, Harriet Jadwiga Fabisiak and William Marsh, testified that there was no downturn in business for Jewel in 1980 to justify a layoff. This court does not find their testimony on this issue credible.

Jewel's decision to lay off 3 wrappers and 2 apprentices and the reasons therefor, the Union found that no apprentice meat cutters had received any notice of layoff but rather that Jewel had decided to lay off 6 wrappers instead. The Union never consented to the layoff of 6 wrappers instead of 3 wrappers and 2 apprentices but since Jewel could lay off any number of employees in any classification it chose so long as it was economically justified and done by seniority within classifications, there was no breach of a Collective Bargaining Agreement.

Jewel's reason for the change in its decision was flexibility. Since apprentices could perform any duty in the Meat Market and meat wrapper duties were limited under the Collective Bargaining Agreement, Jewel determined that it would be nearly impossible to manage its stores if it lost flexibility by laying off 2 apprentices. No ratio of meat wrappers to meat cutters played any part in the decision of which employees were to be laid off and neither Jewel nor the Union ever conveyed to anyone that any ratio played any part in the layoff decision. Prior to the layoff in December 1980 there were about 3 meat cutters and 2 wrappers per store so Jewel ended up with about 1 wrapper per store after the layoff. There were no part-time wrappers on Jewel's payroll at its stores in Northwest Indiana in 1980 and none were hired until the recall period had expired for those full-time wrappers that were laid off in December 1980.

There were no apprentice or journeyman meat cutters laid off in December 1980. Subsequently, Jewel laid off apprentices and journeymen when no wrappers were laid off. The 6 wrappers laid off in December 1980 included the five plaintiffs in this case and Bernie Saborsky. There were no positions available at Jewel to transfer these individuals to in December 1980 since Jewel had experienced layoffs in other areas at that time and was preparing to lay off employees in the Chicago Heights area.

The plaintiffs in this case were all employed by Jewel stores in the Northwest area of Indiana and were members of Local 350 and its successor by merger, Local 320

when they were laid off in December 1980. All of the plaintiffs were eventually terminated from Jewel when their recall rights under the Collective Bargaining Agreements expired.

*Patricia Babrocky*

Ms. Babrocky began working for Jewel on July 10, 1967 at its Columbia Avenue store in Hammond, Indiana as a deli clerk in the Patio Shop. That was the position she requested on her application at Jewel which was the only application she ever filled out at Jewel. Ms. Babrocky worked there for about 2 years and was then transferred to the River Oaks store where she was a deli clerk working on pre-pack and also worked in the Sausage Shoppe. Within a couple of weeks after starting at River Oaks, she wrapped meat from 5 o'clock p.m. to 6:00 o'clock p.m. after the Meat Market closed and later did wrapping work on a steady basis. In April 1974, she became the Sausage Shoppe Manager at River Oaks because the other manager was leaving and recommended her for the position. As manager, she wrapped meat as well as performed other duties required of the position. The manager she replaced was a journeyman who was paid journeyman wages and received time and a half after 6:00 o'clock p.m. She was paid deli clerk wages plus $7.00 per week for being manager and only received straight time after 6:00 o'clock p.m. Although both individuals performed the same duties and held the same position, Ms. Babrocky was paid less wages. There were other journeymen that also worked in the Sausage Shoppe that were paid journeymen wages. Ms. Babrocky never complained to the Union or filed a grievance on the different wages paid to Sausage Shoppe managers.

Ms. Babrocky stayed at the River Oaks store as Manager of the Sausage Shoppe until the store closed on December 31, 1977. Upon request by Jewel, she took a week off and then went to Jewel's store in Merrillvile for 2 to 3 weeks to take Agnes Ross' place as a wrapper temporarily since that was the only position available at that time. She was then transferred to the

Dyer store as a wrapper and remained there until late summer of 1980 when she was transferred to the Columbia Avenue store where she remained for about 2 months until she was transferred to another store where she worked until she was laid off in December 1980 for economic reasons. After leaving the River Oaks store, Ms. Babrocky did not work in a Sausage Shoppe or Chef's Kitchen. Ms. Babrocky never complained to the Union or Jewel about her transfers.

When the River Oaks store closed in December 1977, Jewel had several meetings with employees at the store and told them that the store closing was a special circumstance, that they would not lose anything by the store closing and that Jewel would try to place them. The Union was not present at these meetings. Ms. Babrocky also got assurances from Joe Caria, a District Manager for Jewel, so when she went to the Dyer store as a wrapper, she assumed she would not lose her seniority. After a few months at Dyer, a seniority list was posted and her name appeared third from the top where she had been all along although she did lose the $7.00 per week she had received for being Sausage Shoppe Manager when she was transferred. Ms. Babrocky wanted to continue to be a Sausage Shoppe Manager when River Oaks closed but that was not possible since there was only one other Sausage Shoppe left at that time and it was being phased out.

When Ms. Babrocky was transferred from her position as Sausage Shoppe Manager to wrapper, she changed classifications going from the classification of deli clerk to meat wrapper. Because of the change in classification, she lost her senior-ity as a deli clerk and started over in seniority as a wrapper on January 1, 1978.[5] Ms. Babrocky received notice of her layoff on December 8, 1980 and her last day at Jewel was December 20, 1980.

Ms. Babrocky testified that she thought she had been discriminated against because all females were laid off and the work they had previously done was subsequently done by men.[6] She also testified that the facts which she believed supported her claim were that all meat cutters were male and meat wrappers were female, she was paid less as a Sausage Shoppe Manager than a journeyman who did the same work, and men went home at 5:00 o'clock p.m. and women had to work until 6:00 o'clock p.m. On December 9, 1980, Ms. Babrocky talked with Mr. Clarence O'Conner, the business agent for the Union when he came to the store where she worked, complaining about the layoff because all females were laid off and men that she had been working with were now doing her job. She filed a written grievance related thereto on her last day at Jewel, December 20, 1980. This was the first grievance Ms. Babrocky had filed and she had never complained to the Union before about any problems related to her employment at Jewel. On January 9, 1981, Ms. Babrocky filed her charges of discrimination against Jewel and the Union with the Equal Employment Opportunity Commission (EEOC) and then again spoke with Mr. O'Connor. At that time, Mr. O'Connor indicated that nothing had been done wrong under the Collective Bargaining Agreement with respect to the layoff so the Union could do nothing further on her grievance and that she would get her an-

5. It is not clear from this record exactly when the wrapper seniority list was changed to reflect Ms. Babrocky's wrapper seniority date of January 1, 1978. One of the wrapper seniority lists introduced into evidence showed Ms. Babrocky 3rd from the top with a seniority date of July 11, 1967. Another wrapper seniority list shows her at the bottom of the list with a seniority date of January 1, 1978. In January 1980, 2 wrappers were laid off at Jewel, Ms. Babrocky was not one of them. When the notices for the December 1980 layoff were given, another of the plaintiffs in this case, Wilma Keene, who was one of the wrappers laid off in January 1980, filed a grievance claiming the wrapper seniority list was incorrect and pointed to Ms. Babrocky. Her grievance was found to have merit so the grievance apparently was the impetus for the change in Ms. Babrocky's wrapper seniority date.

6. Ms. Babrocky also complained that the layoff was not done by seniority and that she was singled out with respect thereto. However, she does not claim that the seniority problem was discriminatorily motivated.

swer at the EEOC on the charges she had filed against the Union.

After Ms. Babrocky was laid off by Jewel in December 1980, she applied at all the grocery store chains in the area for a position as a deli clerk or wrapper. She did not apply at any of those stores for a position as an apprentice meat cutter. She also applied at other types of businesses and got a job as a receptionist at Dolton Animal Hospital on February 16, 1983.

On October 12, 1982, Mr. Sam Hill, the area personnel manager for Jewel covering the Northwest area of Indiana, tried to contact Ms. Babrocky to offer her an opportunity to interview for an available position at Jewel for apprentice meat cutter. He was unable to contact her so he sent her a mailgram on October 22, 1982 with respect thereto and requested she contact him by October 29, 1982 if she was interested. Ms. Babrocky contacted Mr. Hill and on October 30, 1982 was interviewed and offered the position of apprentice meat cutter. At the interview, Ms. Babrocky expressed concern about her seniority and the rate of pay she would receive if she accepted the offer. On November 1, 1982, Ms. Babrocky informed Mr. Hill that she did not wish to accept the offer. There was no mention of his lawsuit during these discussions between Mr. Hill and Ms. Babrocky.

Prior to her layoff in December 1980, Ms. Babrocky never told anyone at Jewel that she wanted to be an apprentice meat cutter and in fact, even after her layoff, she asked Mr. Hill for a job in the deli department or Chef's Kitchen and at the EEOC she requested reinstatement to her old job as wrapper. She never sought any other positions at Jewel than the ones she had and Jewel never rejected any request for transfer that she made. No one at Jewel ever said anything that led her to believe that she was being discriminated against on the basis of her sex nor did any incidents occur that would lead to that belief.

*Juanita Coffman*

Juanita Coffman, also known as "Skeets" worked as a wrapper at Buy-Low

grocery store before she went to work for Jewel as a wrapper on March 25, 1974. Ms. Coffman started at Jewel's Tri-City Plaza Store and worked there until she was transferred to a new Jewel store on Mount Street in 1976 where she worked until she was laid off December 20, 1980. She was recalled by Jewel on June 30, 1981, effective July 6, 1981 and worked as a wrapper until she was laid off again on November 30, 1981. Ms. Coffman was hired by Jewel as a wrapper and always remained in that classification during her entire employment by Jewel. She had a wrapper seniority date of March 25, 1984.

While Ms. Coffman was employed by Jewel, she never told anyone at Jewel that she wanted to be an apprentice meat cutter nor did she ever request a promotion. One time she requested to be transferred to Jewel's store in Merrillville so she would be closer to home but there were no available openings so the request was denied. She does not maintain that Jewel's denial of this transfer was based on her sex. While Ms. Coffman was employed by Jewel, she never heard that Jewel did not want to recruit women in general or for an apprentice position in particular nor had she heard that the Collective Bargaining Agreements treated men and women differently. Further, she knew that she did not receive the same pay as meat cutters who were in a different classification nor did she ever see a wrapper do meat cutter work.

When Ms. Coffman was laid off, she was told it was due to a slow down in business. She was never told she was being laid off because she was a woman. Ms. Coffman thought that apprentice meat cutters should have been laid off because some of the wrappers had more seniority than the apprentices that were not laid off but that was the only reason she thought the seniority system treated men and women differently. She also thought she was discriminated against because Jewel did not transfer her when it had transferred journeymen from Illinois Jewel stores to Indiana Jewel stores earlier when they were faced with being laid off. Ms. Coffman filed a grievance with the Union and charges of

discrimination against Jewel and the Union related to the layoff with the EEOC. She requested and received her Notice of Right to Sue from the EEOC on April 22, 1981.

On May 20, 1982, Jewel sent Ms. Coffman a letter informing her that as of May 30, 1982, she would have completed six months on layoff and that pursuant to the terms of the Collective Bargaining Agreement she was to send Jewel notice of her desire to remain on the recall list and do so each month thereafter until November 30, 1983. The letter further informed her that if she did not send Jewel such notice of her desire to remain on the recall list, Jewel would assume that she was not interested in being recalled and would therefore be terminated from Jewel. By letter dated November 24, 1982, Jewel informed Ms. Coffman that her seniority and recall rights had expired under the then effective Collective Bargaining Agreement.

In October 1982, Mr. Sam Hill, the Personnel Manager for Jewel, tried to contact Ms. Coffman by phone but her phone was disconnected so Mr. Hill sent her a mailgram informing her of an opening for an apprentice position and requesting that she contact him with respect thereto. Ms. Coffman contacted Mr. Hill on October 16, 1982 and Mr. Hill offered her an apprentice meat cutter position. Ms. Coffman told Mr. Hill that she had to think about whether she wanted to be an apprentice and asked to think about it until October 18, 1982. Mr. Hill had not received a response from Ms. Coffman by October 29, 1982 so he sent her a registered letter that indicated that he would assume she did not want to be considered for the position if he didn't hear from her by November 3, 1982. Mr. Hill received no response from Ms. Coffman to his October 29th letter. This lawsuit was not discussed at any time during these activities or conversations.

Ms. Coffman had never asked Jewel prior to her 1980 layoff to be an apprentice meat cutter. At trial, Ms. Coffman testified that she would have taken an apprentice position before 1980 or in 1980 to avoid being laid off but that she didn't really want to lose her seniority and would rather be a wrapper.

After Ms. Coffman was laid off by Jewel, she worked at various grocery stores including Thrifty Mart, Buy-Low and Key Market for short periods of time totalling about 4½ months and then got a job at El Mar's Restaurant on August 17, 1982. She worked there for sometime and then got a job as a bill collector for Business Revenue Systems in Crown Point in August 1984. She did not look for a job at other grocery store chains.

*Eva Davis*

Ms. Davis was first employed by Jewel in October 1970 or 1971 as a part-time receiving clerk in groceries, a position that was not part of the Meat Market, at Jewel's Store in Tri-City. In March 1974, at her request she became a full-time wrapper at the same store and remained in the wrapper classification for the rest of the time she worked for Jewel although she worked at several different Jewel stores. Ms. Davis was laid off for 2 months in 1975 but otherwise worked continuously until she was laid off on December 20, 1980, having received notice thereof two weeks before.

While Ms. Davis was employed by Jewel, she never told anyone at Jewel or the Union that she wanted to be an apprentice meat cutter nor did she ever ask for a promotion, another position, transfer or other job assignment. Although she was transferred several times, she was not unhappy about the transfers and never complained to or filed a grievance with the Union related thereto. While working at Jewel, no one in Jewel management ever said anything to her that caused her to believe she was being discriminated against because of her sex although some journeymen in the backroom said women couldn't work in the backroom because they would be in the way and that Jewel didn't hire women meat cutters. Ms. Davis knew, however, that there was 1 female meat cutter at a Jewel store in Chicago and further, she never reported these conversations to anyone in Jewel management. While Ms. Davis was a wrapper she sometimes worked in the Sausage Shoppe when the regular Sausage Shoppe employees

were on lunch break although she wasn't supposed to under the Collective Bargaining Agreement and also observed others doing work outside of their classifications. She never reported these incidents to Jewel or to the Union.

Ms. Davis testified that she believed that she was discriminated against because Jewel never gave her an opportunity to be an apprentice meat cutter nor offered her such a position. She also claims she was discriminated against because journeymen did wrapper work at different pay and pointed to Gene Forbes. Ms. Davis testified that she never saw him cut meat but also admitted that she did not work with him all of the time. Finally, Ms. Davis maintains she was discriminated against because only women were laid off in December 1980 when there were apprentices with less seniority that were still working. In her mind, it would have been acceptable if some women and some men had been laid off and suggested that the wrapper and apprentice classifications should have been merged and then laid off by seniority.

Ms. Davis was told she was being laid off because of a downturn in business and no one ever said it was because of her sex. She filed a grievance with the Union and a charge of discrimination against Jewel and the Union with the EEOC in January 1981 as a result of the layoff. This was the only EEOC charge she had ever filed and was the first grievance she had filed while employed by Jewel. She requested reinstatement to her old job as wrapper at the EEOC.

On February 2, 1982, Jewel sent Ms. Davis a letter indicating that it had not received any letter from her since September 21, 1981 with respect to her continued interest in remaining on the recall list as required by the Collective Bargaining Agreement. The letter further informed her that she was therefore being separated from Jewel effective February 22, 1982 and was no longer subject to recall by Jewel.

On October 12, 1982, Mr. Sam Hill contacted Ms. Davis and informed her that there was an opening for an apprentice meat cutter at Jewel. Ms. Davis inter-viewed for and was offered the position on October 13, 1982. At the interview, Ms. Davis was concerned because she was 50 years old and afraid she could not handle the job. She asked for a couple of days to think it over. On October 27, 1982 Ms. Davis called Mr. Hill and told him she thought she could do 90% of the job but declined the offer because she did not want to give up her wrapper seniority or take a reduction in wages to the starting apprentice rate. This lawsuit was not mentioned in any of these conversations.

Ms. Davis had never asked Jewel prior to her December 1980 layoff to be an apprentice meat cutter. At trial, Ms. Davis testified that if she had been offered an apprentice position in 1980, she would have taken the position just to avoid being laid off. After she was laid off, Ms. Davis looked for wrapper positions at various chain stores in the area but never applied for a meat cutter position.

*Wilma Keene*

Ms. Keene was hired by Jewel for part-time work in the Chef's Kitchen in November 1972. In 1974, Jewel advised her of an opening for a full-time wrapper position which she took and started April 29, 1974. She had filled out an application with Jewel for that position. Ms. Keene was laid off in January 1980 having received prior notice thereof that the layoff was due to a decline in business. Apprentice meat cutters were also laid off in January 1980. In May 1980, Ms. Keene got a letter from Jewel to return to work as a wrapper and she did so. She worked from May until December 8, 1980 when she was laid off again due to a decline in business.

Ms. Keene filed a grievance with the Union in December 1980 when she found out the wrapper seniority list was wrong relating to her layoff in January 1980 claiming she was laid off out of seniority. Ms. Keene maintained that she was third from the bottom of the wrapper seniority list and since only two wrappers were laid off at that time, she shouldn't have been. She pointed to Patricia Babrocky who had transferred from the Sausage Shoppe to a

wrapper position in 1978 so her seniority date should have changed. Although Ms. Keene's grievance was filed well beyond the 45 day period provided in the Collective Bargaining Agreement, the Union processed her grievance and resolved it with Jewel on January 27, 1981.[7] She did not file any discrimination charges related to the January 1980 layoff nor did she ever tell anyone that she thought she was being laid off because of her sex.

Ms. Keene also filed a grievance with the Union as well as discrimination charges with the EEOC relating to her December 1980 layoff. She never talked to Union officials about this grievance. According to Ms. Keene, the December layoff was according to seniority. Ms. Keene requested reinstatement to her old position as wrapper at the EEOC.

While Ms. Keene was working at Jewel, she never told anyone at Jewel that she wanted to be an apprentice meat cutter, never sought another position with Jewel nor ever asked for a transfer, promotion, different job assignment or training. She was never told by anyone in Jewel management that she or any other female could not be a meat cutter or that she wouldn't be considered for a different position if she so requested. Although some men in the backrooms at Jewel had said they didn't think women could handle jobs back there, Ms. Keene admitted that no one in Jewel management had ever said that. Ms. Keene also testified that the Union never told her she was being laid off because she was female. While Ms. Keene worked for Jewel, she observed people doing work outside of their classification which she identified as wrappers doing deli work, fish department employees doing wrapping work and journeymen doing wrapping work when wrappers were laid off. She never filed a grievance related thereto however.

Ms. Keene testified that she believed she had only been discriminated against by the layoff because she was laid off and shouldn't have been. She maintains that

there were too many meat cutters but not too many wrappers and Jewel laid off wrappers. Ms. Keene was also upset because there was no opportunity for women to grow at Jewel. She also maintained that the Union discriminated against her because it did not take up her second grievance.

After Ms. Keene was laid off by Jewel, she got a job as a wrapper with Dominick's, another chain grocery store, and started in July 1981. Although she started at the bottom of the wrapper seniority list at Dominick's, she received the top rate of pay for wrappers because of her prior experience. Employees at Dominick's who are part of the same Union as the Union at Jewel, have the same job classifications and are under the same layoff and recall procedures as Jewel employees in the Meat Market. Ms. Keene never asked Dominick's if there were any other positions available nor did she ever look for apprentice or journeyman positions when she was laid off by Jewel, only positions as wrapper.

By letter dated June 8, 1981, Jewel informed Ms. Keene that pursuant to the terms of the Collective Bargaining Agreement, she had to send Jewel a letter stating her desire to remain on the recall list at Jewel within 6 months after her layoff and every month thereafter until her recall period expired on October 8, 1982. On October 12, 1982, Mr. Sam Hill contacted Ms. Keene and informed her of an opening for an apprentice position at Jewel and offered to interview her for the position. She told Mr. Hill that she was a wrapper at Dominick's and wasn't sure she wanted to be an apprentice meat cutter. Ms. Keene interviewed for and was offered a position as Apprentice with Jewel on October 14, 1982. At that interview, Ms. Keene expressed concern that if she wasn't able to make it as an apprentice, she would be released. On October 16, 1982, she informed Jewel that she didn't want the apprentice position because she would lose her seniority as a

**7.** Ms. Keene was awarded $4,495.40 upon resolution of her grievance, and received $3,039.40 after taxes and unemployment benefits were

taken out. They had a conflict with the Union and Jewel over the deduction of unemployment benefits but it was resolved her way.

wrapper and didn't want to take a reduction in pay to beginning apprentice rates. She confirmed by letter her decision to decline the offer for the reasons she stated earlier. There was no mention of this lawsuit in any of the conversations between Mr. Hill and Ms. Keene nor in her letter to Mr. Hill.

Ms. Keene had never asked Jewel prior to her December 1980 layoff to be an apprentice meat cutter. At trial, Ms. Keene testified that if Jewel had posted a notice of an opening for an apprentice position or offered her such a position, she would have taken the position.

*Agnes Ross*

Ms. Ross applied at Jewel for a position as a part-time produce clerk and was hired for that position in September 1968. She worked in that position until January 1971 and Jewel then asked her if she would transfer to the Chef's Kitchen because it was having problems with some part-time people in that area. Ms. Ross worked as a clerk in the Chef's Kitchen for one year and then became an assistant manager in the Chef's kitchen at Jewel's request and was training to become a manager. Jewel offered her a position as manager of Chef's Kitchen but she declined the offer. No one told Ms. Ross that she could not be a manager. She was the Assistant Manager under Edna Pace until January 1974 when Jewel asked her if she would transfer to the Meat Market because Jewel needed a full-time deli person. She filled out a new application at Jewel's request because of the switch to full-time work. The application indicated she wanted a position as full-time clerk, checker or deli stock. When she took the job in the Meat Market, she was reclassified as a wrapper with a new seniority date as wrapper of January 20, 1974. From the time she became a wrap-

per until she was laid off, Ms. Ross worked as wrapper and Deli Manager in the Meat Market at Jewel although she worked at several different stores. Jewel offered her the different positions and each one was a promotion. Ms. Ross was laid off from Jewel on December 20, 1980. By letter dated May 22, 1981, Ms. Ross was recalled by Jewel effective June 1, 1981 and worked at Jewel until November 30, 1981 when she was laid off again.

Ms. Ross and Ms. Coffman were called to a meeting in early December 1980 with the Store Manager and Market Manager and were told that they were going to be laid off because of a downturn in business. Ms. Ross was not surprised because everyone knew it was going to happen due to a downturn in the economy and the fact that the stores were not doing well. At the meeting she was told that there were to be 3 wrappers and 2 apprentice meat cutters laid off. A couple of days later, she learned that there were to be all wrappers laid off instead. Neither Mr. Stolz, the Store Manager, nor Mr. Wagner, the Market Manager, ever said she was being laid off because she was a woman.

Ms. Ross called Mr. O'Connor, the business agent for the Union for an explanation about the layoff. This was the first complaint or grievance that Ms. Ross had lodged with the Union.[8] Mr. O'Connor told her that the layoff was due to a downturn in business. When Ms. Ross asked him why the five plaintiffs were being laid off when there were less senior people working the Meat Market, Mr. O'Connor told her that Jewel said that this would be the way the layoff would be handled and that Jewel could lay off any one they chose so long as they laid off by seniority within the various classifications.[9] After the conver-

---

**8.** Ms. Ross also filed a grievance with the Union relating to another Jewel employee, Edna Pace. Ms. Ross' complaint was that Ms. Pace was transferred outside the Meat Market into another classification in the Chef's Kitchen for about 6 years but retained her seniority as wrapper in the Meat Market. Jewel responded that Ms. Pace's seniority was correct because she was forced to make the move to the Chef's Kitchen and Jewel had told her she would not lose her

seniority because of the transfer and had a letter in Ms. Pace's file to that effect. Ms. Ross does not maintain that the handling of this grievance was discriminatory.

**9.** This court does not find credible Ms. Ross' testimony regarding alleged statements made by Mr. O'Connor relating to any layoff ratio, the Union being male dominated, or the Union not wanting women in the Meat Market.

sation with Mr. O'Connor, Ms. Ross, her husband, Mr. O'Connor and Kermit Ray, another Union official, had a meeting regarding the layoff. At that meeting, Ms. Ross was told by the Union that although she might have a moral claim regarding the layoff, she did not have a claim under the Collective Bargaining Agreement. There were no remarks by the Union at the meeting that Ms. Ross was being laid off because of her sex. Further, Ms. Ross did not accuse the Union of not processing her grievance because of her sex at that meeting. At the meeting, the Union did tell Ms. Ross that if she obtained more information, she should come back to the Union and the Union would see if anything else could be done. Ms. Ross went back to the Union with two more grievances and many letters and information about people with less seniority doing her job, particularly complaining about meat cutter doing wrapper work on a long term basis which she claimed was the equivalent of them doing work outside of their classification. The Union provided her no further help. However, Ms. Ross testified that she had no facts to justify a belief that the Union processed her grievances in the manner it did because of her sex.

In addition to the grievances she filed with the Union, Ms. Ross filed charges of discrimination against the Union and Jewel with the EEOC in January 1981 relating to her December 1980 layoff. The basis of her claim against the Union was the ratio provision in the Collective Bargaining Agreement. In February, Ms. Ross told the EEOC that she wanted to be reinstated to her wrapper position at Jewel and requested her right to sue notice from the EEOC on March 30, 1981.

While Ms. Ross was employed by Jewel, she never told anyone at Jewel that she wanted to be an apprentice meat cutter, never requested another position with Jewel nor ever asked for a transfer, promotion, different assignment or training. Ms. Ross testified that she did not know of any woman that told Jewel or the Union that they wanted to be an apprentice meat cutter or that applied for an apprenticeship and were turned down. Further, Ms. Ross knew of no man that was told he could not be a meat wrapper at Jewel. Prior to her layoff, Ms. Ross never complained that Jewel had not asked or considered a woman for an apprentice position. Further, Ms. Ross testified that she knew nothing nor had she heard anything before the layoff that caused her to believe she had been discriminated against by Jewel or the Union. She never filed a grievance with the Union complaining that she was denied an opportunity to be an apprentice meat cutter.

On May 20, 1982, Jewel sent Ms. Ross a letter informing her that as of May 30, 1982 she would have completed 6 months on layoff and that under the Collective Bargaining Agreement she had to send Jewel notice of her desire to remain on the recall list and do so each month thereafter until November 30, 1983. That letter also informed her that if she did not send such notice, Jewel would assume that she was not interested in being recalled and would therefore be terminated from Jewel. By letter dated November 24, 1982, Jewel informed her that her seniority and recall rights had expired under the effective Collective Bargaining Agreement since she was not actively employed and working on May 27, 1982.[10]

On October 12, 1982, Mr. Sam Hill at Jewel called Ms. Ross and informed her of an opening for an apprentice meat cutter position at Jewel. Ms. Ross interviewed with Mr. Hill on October 13, 1982 and he offered her the apprentice position. At that time, Ms. Ross was concerned that she would lose her seniority rights and what would happen if she wouldn't be able to do the job and did not like the idea of starting

10. Ms. Ross also apparently filed a grievance with the Union relating to her termination or expiration of her recall rights at Jewel in late 1982. The Union forwarded the grievance to Jewel who responded that her recall rights had expired under the terms of the effective Bargaining Agreement and that no part-time wrappers had been hired at Jewel until November 15, 1982 after her recall rights had already expired. The Union notified Ms. Ross of Jewel's response.

at the beginning apprentice rate. She also stated that she preferred to be a meat wrapper. On October 18, 1982, Ms. Ross called Mr. Hill and informed him that she declined the offer and followed up the telephone conversation with a letter. In that letter Ms. Ross reiterated that she declined Jewel's offer because she would have to give up her seniority rights and take a reduction in wages. No reference was made during any of the conversations between Mr. Hill and Ms. Ross or in Ms. Ross' letter to Mr. Hill about this lawsuit.[11]

Ms. Ross maintains that she was discriminated against in the December 1980 layoff because it was not fair since there were less seniority people still working doing wrapper work, including journeymen, apprentices and part-time deli employees. She testified that she thought the layoff should have been done by overall seniority in the Meat Market.

All of the EEOC charges filed by the plaintiffs in this case were basically the same although they had minor differences in the dates each of the plaintiffs were hired by Jewel or became members of the Union. The charges against the Union were basically as follows:

I. Respondent Union changed Section 1.2(d) of the new contract to include a 1:4 ration of Wrappers to Meat Cutters. This change has resulted in the layoff of Wrappers, a classification held by females only. Respondent Union has over 20 members. I have been a member of the union since July 1967.

II. Mr. Clarence O'Connor, Business Representative, stated that the change in the contract should have no impact on the Respondent Employer's lay-off practices.

III. I feel that I have been discriminated against because of my sex, female, in that:

A. The actual ratio of Wrappers to Meat Cutters at Respondent Employer had been 1:2.

B. The two job classifications are sex-segregated in the Northwestern Indiana Zone: All Wrappers are female and all Meat Cutters are male.

C. The effect of the new, un-ratified ration has been to decrease the number of Wrapper positions. The excess Wrapper work is currently being performed by male Meat Cutters.

Respondent Union has failed to represent its female Wrapper members as a class by inserting a ratio into the contract which will decrease the number of Wrapper positions available.

According to standard operating procedure, the Union turned the charges over to their attorney when it received them. The charges against Jewel were basically as follows:

I. I was laid off from my position as Wrapper on December 20, 1980. I had been employed by Respondent since 1967.

Respondent employs over 15 persons.

II. Mr. Sam Hill, Personnel Manager stated that the lay-off was required due to a slow down in business and the employment ratio of meat cutters to wrappers established in Section 1.2(c) of the Chains Retail Meat Cutters Contract for 1980–1982.

III. I feel that I have been discriminated against because of my sex, female, in that:

A. Respondent has sex-segregated job classifications of Meat Cutters and Wrappers. All the wrappers employed by Respondent in the Northwestern Indiana Zone are females (approximately 15). All Meat Cutters in the zone are male (approximately 31).

B. Because of the new provision in the union contract which calls for a

---

11. Ms. Ross' testimony regarding her desire to be a meat cutter is wishy-washy at best. On one hand, Ms. Ross testified that she would have applied for an apprentice position if notice of an opening had been posted because of job security and the fact that it would have been a promotion. On the other hand, she testified that she would not have accepted an offer to become an apprentice in 1978 or 1980 because she didn't want to lose her wrapper seniority.

ratio of one wrapper to 4 Meat Cutters. Respondent layed off only Wrappers (6) in that zone.

C. Wrappers work is currently being performed by male Meat Cutters.

Respondent is discriminating against female wrappers as a class in lay-off and sex segregated job classifications.

All of the plaintiffs received a Notice of Right to Sue with respect to these charges dated April 22, 1981.

Mr. Hill talked to all of the plaintiffs in October 1982 because apprentice positions had become available at Jewel. The plaintiffs were approached about the openings because they had expressed an interest in becoming apprentice meat cutters after they were laid off from their wrapper positions. None of the wrappers who were still employed by Jewel nor Bernie Saborsky, the other wrapper affected by the December 1980 layoff, were offered apprentice positions because they never requested nor expressed any interest in an apprentice position. Mr. Hill never told any of the plaintiffs that the offer of an apprentice position in late 1982 was in any way related to this case.

The Union processed grievances from its female members many times and the sex of the party filing the grievance did not affect the way the Union handled a grievance. If the Union received a complaint or grievance from one of its members, it would investigate the matter. If the grievance had merit, the Union would pursue it but if it did not have merit, it would explain why it did not under the terms of the Collective Bargaining Agreement.

## II.

As noted earlier in this Memorandum and Order, the Seventh Circuit Court of Appeals' decision rendered in this case in 1985 addressed the same basic issues in a summary judgment context that must now be decided after a trial on the merits. *See Babrocky v. Jewel Food Co. & Retail Meat Cutters Union, Local 320,* 773 F.2d 857 (7th Cir.1985). That opinion, therefore, is "the law of this case" and provides a road map for this court to follow in rendering its decision on the merits of this case.

This case is premised on a theory of discriminatory treatment, not discriminatory impact, so evidence of discriminatory animus is required. *Id.* at 866 n. 6. The factual inquiry in this type of Title VII case, therefore, is whether the defendants intentionally discriminated against the plaintiffs, *United States Board of Governors v. Aikens* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Texas Dept. of Community Affairs. v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and the plaintiffs have the ultimate burden of showing intentional discrimination, i.e., that the defendants were treating some people less favorably than others because of their race, color, religion, sex or national origin. *Burdine, supra* at 253, 101 S.Ct. at 1093–94; *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977); *Nellis v. Brown County,* 722 F.2d 853, 856 (7th Cir.1983).

In a disparate treatment case, a plaintiff must prove discrimination by a preponderance of the evidence. A plaintiff can prove a case of discrimination with direct or circumstantial evidence or can make the required showing of discrimination by using the method of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and further explained in *Texas Dept. of Community Affairs v. Burdine, supra.* Under *McDonnell Douglas* as clarified and explained in *Burdine,* a plaintiff must first establish a *prima facie* case of discrimination. The *prima facie* case element is flexible and may be adapted to the fact situation as appropriate. *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *Babrocky,* 773 F.2d at 866. A *prima facie* showing by the plaintiff raises an inference of unlawful discrimination only because of a presumption that these acts otherwise

unexplained are more likely than not based on impermissable factors. *Furnco Construction Corp. v. Waters*, 438 U.S. at 577, 98 S.Ct. at 2949–50; *Teamster v. United States*, 431 U.S. at 358 n. 44, 97 S.Ct. at 1866 n. 44. If a plaintiff establishes a *prima facie* case, a rebuttable presumption arises that the defendant unlawfully discriminated against the plaintiff and the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for its employment action. *Furnco Construction Corp. v. Waters, supra; Board of Trustees of Keene State College v. Sweeney, supra.* In articulating its reasons, the defendant must be clear and reasonably specific though it need not convince the court that it was actually motivated by those reasons. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Sweeney*, 439 U.S. at 25, 99 S.Ct. at 295–96; *Nellis v. Brown County*, 722 F.2d at 856. If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted and the factual inquiry leads to a new level of specificity: the plaintiff must then show that the employer's proffered reason or reasons were merely a pretext or cover-up for discrimination. *Burdine, supra* 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *Furnco, supra* 438 U.S. at 577–78, 98 S.Ct. at 2949–50; *McDonnell Douglas, supra* 411 U.S. at 802–805, 93 S.Ct. at 1824–26; *Coates v. Johnson & Johnson*, 756 F.2d 524, 530–31 (7th Cir.1985). A plaintiff can show pretext in one of two ways: (1) the employer was more likely motivated by a discriminatory reason; or (2) the employer's proffered reason is unworthy of credence. *Burdine, supra* 450 U.S. at 253–54,

101 S.Ct. at 1093–94; *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 513 (7th Cir.1986). A plaintiff can show that the employer's proffered reason is unworthy of credence in three ways: (1) the company's reason or reasons have no basis in fact; or (2) if they have a basis in fact, by showing that they were not really factors; or (3) if they were factors, by showing they were jointly insufficient to motivate the adverse employment decision, i.e. the proffered reason was so removed in time that it was unlikely to be the cause or the proffered reasons applied to other employees with equal or greater force and the company made a different decision with respect to them. *See, e.g., LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1414 (7th Cir.1984). Further, it is not the court's duty to determine the validity of a company's employment decision as long as the decision was made in good faith in the exercise of its business judgment. Thus, absent discriminating intent, an employment discrimination action is not an appropriate forum in which to question an employer's business judgment. *See LaMontagne, supra* at 1409; *Kephart v. Institute of Gas Technology*, 630 F.2d 1217 at 1222–23.[12]

The plaintiffs' claims of discrimination against Jewel and in part against the Union, according to the earlier Seventh Circuit opinion in this case, include instituting and maintaining sex segregated job classifications, discriminatory recruiting, hiring, transfer and promotion practices and unequal compensation practices. *Babrocky*, 773 F.2d at 855.[13] In addition to these

---

12. In their brief, the plaintiffs maintain that the *McDonnell Douglas-Burdine* method of proof is altered in a case involving a charge of disparate treatment based on the pattern and practice of an employer citing to Judge Shadur's opinion in *E.E.O.C. v. Chicago Miniature Lamp Works*, 622 F.Supp. 1281 (N.D.Ill.1985). Although their assertion may well be true, it does not apply in this case because this is not a "pattern-or-practice" case since it does not, unlike *Chicago Miniature Lamp Works*, involve claims of classwide discrimination. *See Babrocky*, 773 F.2d at 866 n. 6.

13. The Seventh Circuit also made reference to discriminatory training claims as well as "possi-

ble discriminatory misuse of the seniority system, particularly regarding Jewel's and the Union's use of the newly adopted 1:4 hiring ratio to justify laying off only women employees." *Babrocky*, 773 F.2d at 865. All training at Jewel is done "on-the-job" so there is no separate training program as such which could form the basis of an independent claim of discriminatory training. However, since training is done on the job it is included in plaintiffs' other claims. Further, the evidence discloses that the 1:4 ratio was not applicable to plaintiffs and therefore the "possible misuse of the seniority system' claim is without merit and need not be discussed further."

claims, the plaintiffs also asserted a Title VII claim against the Union based on a breach of its duty of fair representation.

### A. Sex Segregated Job Classifications, Recruitment, Hiring, Transfer and Promotion Claims

The plaintiffs' claims of discrimination relating to sex segregated job classifications, and discriminatory recruiting, hiring, transfer and promotion practices are, as recognized by the Seventh Circuit, interrelated, *Id.*, and can be discussed collectively. In this case, the basic factual underpinning of these five claims is that there were and still are no female meat cutters at Jewel stores in the Northwest area of Indiana which translates into no females being recruited, hired, transferred or promoted into the meat cutter classifications at those stores. Although there may be minor differences in these various practices, for purposes of determining the elements of a *prima facie* case the plaintiffs must show to be entitled to an inference of discrimination, they can all be basically treated as failure to hire claims which requires the plaintiffs to prove (1) that they are members of a protected class, (2) that they were qualified and applied for meat cutter positions, (3) that despite their qualifications, they were rejected from the positions, and (4) that the employer hired someone not in the protected class. See *McDonnell Douglas,* supra, 411 U.S. at 802, 93 S.Ct. at 1824; *Babrocky,* 773 F.2d at 866. However, as noted by the Seventh Circuit, certain factual settings may not lend themselves to a literal application of these elements and in such cases, the court must be flexible in analyzing the evidence presented by plaintiffs to determine if adequate evidence was presented to create an inference that an employment decision was based on a discriminatory criterion. *Babrocky,* 773 F.2d at 866.

The plaintiffs have shown that they were all female and thus within a class protected by Title VII; that they were all over 18 years of age which was the only technical

qualification under the Collective Bargaining Agreements for becoming an apprentice meat cutter; [14] that none of them were hired as meat cutters by Jewel; and that Jewel hired all male meat cutters at its stores in Northwest Indiana. The critical element of the *prima facie* case in the analysis of these claims, even as recognized by the Seventh Circuit in its decision at the summary judgment state, is that the plaintiffs admittedly never applied to be meat cutters at Jewel. With respect to this issue, the Seventh Circuit stated as follows:

> Because an employer may create an atmosphere in which employees understand that their applying for certain positions is fruitless, even nonapplicants can in appropriate circumstances qualify for relief under Title VII. "A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of of explicit and certain rejection." *Id.* [431 U.S.] at 365, 97 S.Ct. at 1869. The Court's explicit reference to "the manner in which [the employer] publicizes vacancies," *id.,* as one of the ways in which such implicit messages are communicated, is particularly telling. In the instant situation Jewel evidently filled its meat-cutter positions through the Union's hiring hall. No notices of vacancies were ever posted, nor had the Union ever recommended any of its women members for these positions. Consequently the plaintiffs were never informed of the vacancies for which they could apply. Therefore, the district court's reliance on the plaintiffs' admissions that they had never applied for meat-cutter positions was misguided.

■ There is no evidence in this case of any atmosphere at Jewel stores in Northwest Indiana or at Jewel stores in general that would have caused plaintiffs to understand that it would be fruitless for them to apply for meat cutter positions. The plain-

---

**14.** At trial, the defendants conceded that they were not raising any bona fide occupational

qualification issues in this case.

**1420**

tiffs testified that no one had ever told them that they could not be meat cutters nor had they heard of women who had applied for apprentice meat cutter positions but were not accepted for employment in that position. Further, one of the plaintiffs, Patricia Babrocky, even testified that she had read about a female in Chicago that had become an apprentice at Jewel in a news bulletin called "The Flash" that was circulated to all Jewel stores. Thus plaintiffs cannot rely on an atmosphere argument to excuse their failure to apply for apprentice meat cutter positions.[15]

Nor can plaintiffs rely on a "consistently enforced discriminatory policy" to excuse their failure to apply for apprentice meat cutter positions. The plaintiffs maintain that they presented evidence of a Jewel's policy of excluding women from meat cutter positions through the testimony of David Sykes and William Marsh, both Market Managers for Jewel at times. Mr. Sykes testified that his belief that Jewel had such a policy was based on his observation that there were no female meat cutters at Jewel store in Northwest Indiana, although no one at Jewel had ever told him that Jewel had such a policy. This court finds that Mr. Sykes' inference from his observation to his conclusion is speculative at best and is not probative evidence of any policy on the part of Jewel to exclude women from meat cutter positions in Northwest Indiana. Likewise, this court does not find Mr. Marsh's testimony regarding his "plan" probative evidence of a discriminatory policy on the part of Jewel. He was never told by anyone in Jewel management that Jewel had a policy of excluding women from meat cutter positions nor did he ever discuss, let alone obtain approval for, his "plan," and Market Managers do not set policy nor have authority to hire or fire employees in the Meat Market. Furthermore, there is no evidence in this record

that he ever disclosed his "plan" to the plaintiffs in this case nor did any of the plaintiffs testify that they were aware of any such policy. Rather, they testified that they were not aware of any discrimination until they were laid off in December 1980. Finally, the fact that a female in Chicago became an apprentice meat cutter when she so requested and Jewel published the fact in a bulletin disseminated to all Jewel stores indicates that Jewel had no such policy against women becoming meat cutters during the time plaintiffs were employed at Jewel.[16] Accordingly, the plaintiffs have failed to show that Jewel had a policy that they were aware of that formed a basis for their failure to apply for apprentice meat cutter positions because they were "unwilling to subject themselves to the humiliation of explicit and certain rejection."

Jewel did not post notices of vacancies or available meat cutter positions nor did it fill its meat cutter positions through any union hiring hall. Jewel meat cutter positions were filled through job service contacts, word of mouth and walk-ins. There is no evidence that Jewel in any way kept information about available meat cutter positions from the plaintiffs or women in general, steered them into or away from any particular position or in any way treated them differently than males with respect to its recruitment or hiring practices. Males and females had the same access to hiring information and the failure of Jewel to post notices of vacancies had the same impact on males and females. Furthermore, the evidence reveals that the plaintiffs were hired into the positions they requested so none of them suffered any actual injury as a result of Jewel's recruitment and hiring practices. Accordingly, the plaintiffs have failed to present evidence to support any of the possible theories identi-

15. As noted earlier, this court did not find the testimony of William Marsh regarding his "plan" to be credible and furthermore he never disclosed his "plan" to plaintiffs so that evidence is not probative of any adverse atmosphere. Further, the plaintiffs all testified that nothing was said or done to them before their layoff that

would suggest that Jewel was discriminating against women.

16. In addition, Jewel's offers of apprentice meat cutter positions to the plaintiffs in October 1982 would also support the conclusion that Jewel did not have any policy against women becoming meat cutters.

fied by the Seventh Circuit for excusing their failure to apply for meat cutter positions at Jewel.

The plaintiffs have likewise failed to show that they were discriminated against by Jewel by not being promoted to apprentice meat cutter positions. In *Box v. A & P Tea Co.*, 772 F.2d 1372 (7th Cir.1985), the Seventh Circuit Court of Appeals addressed the issue of the failure of a Title VII plaintiff to apply for a promotion in a factual situation similar to the present case. In *Box*, the employer did not have a formal system of posting job openings and allowing employees to apply for them but rather, the A & P store managers promoted employees to assistant manager without asking for applications or posting the openings. The Seventh Circuit held that in such a situation the application requirement of a prima facie case is loosened somewhat and that a plaintiff can establish the application element of a prima facie case by showing that, had she known of an assistant manager opening, she would have applied. *Id.* at 1377. In *Box*, the Seventh Circuit found the plaintiff had failed to establish the application element of a prima facie case and affirmed a summary judgment ruling in favor of the employer, A & P. In explanation of its holding, the Court stated as follows:

> Only three statements in the entire record lend any support to Box's claim. First, Box wrote on her EEOC complaint that individuals with less seniority had been promoted to assistant manager. In her deposition, Box stated that she had asked her store manager for training "[t]o move up, in order to make more money, bookkeeper, assistant manager, whatever." Third, Box stated in her affidavit that she had told her store manager that she "wanted to receive training for some other position so [she] could advance, for instance, into the assistant manager position."
>
> None of these statements suggest anything more than a vague interest in the assistant manager position; indeed, the two most recent statements (the deposition and the affidavit) refer to the assistant manager position only as an example

of the type of promotion in which Box might be interested. Although, as we held above, a nonapplicant plaintiff can establish a prima facie case if the employer did not solicit applications, such a plaintiff might show what positions she would have applied for had she known of the openings. The plaintiff has submitted evidence that an A & P employee could be promoted to assistant manager in any of the Chicago division stores and that A & P promoted twenty-seven male grocery clerks to assistant manager positions in A & P's Chicago division between 1975 and 1978. But, after four years of discovery, Box has failed to identify for which of these twenty-seven positions she would have applied. A motion for summary judgment requires the court to view the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences therefrom, but this procedural context neither requires nor permits a court to speculate what the plaintiff would have done. *Posey v. Skyline Corp.*, 702 F.2d 102, 111 (7th Cir.), *cert. denied*, [464] U.S. [960] 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Since the uncontradicted evidence in the record reveals that Box never applied for a promotion to assistant manager, she needed to set forth specific facts showing that she could nonetheless establish a prima facie case. She needed to do more than show she had a general interest in obtaining some job other than the one she had. This is a close case, but we hold that the three statements of general interest were not enough and we therefore affirm the summary judgment for A & P.

*Id.* at 1377.

In the case before the court, discovery has been completed, the case has been tried and the plaintiffs have failed to show what apprentice meat cutter positions they would have applied for if they had known of the opening. The plaintiffs have testified that 3 or 4 apprentices were hired while they were employed by Jewel and the 1980 seniority list for apprentices and journeymen indicates that there were between

4 and 6 apprentices hired during the time plaintiffs were employed by Jewel. None of the plaintiffs, however, have identified for which of these positions she would have applied had she known of the opening. There is no evidence in this case that any of the plaintiffs ever really wanted to be a meat cutter or ever expressed any interest in becoming an apprentice until after they were laid off in December 1980.[17] In fact, the plaintiffs all declined offers of positions as apprentice meat cutters at Jewel in 1982 and some indicated that they would not have taken apprentice positions before the layoff even if they had been offered such positions. Thus, as recognized by plaintiffs, it is a matter of pure speculation as to plaintiffs' real desire to become a meat cutter at Jewel while they were employed as wrappers. Furthermore, the evidence shows that plaintiffs received the positions and promotions they requested and that they never requested a position as or promotion to a meat cutter at Jewel. They have presented no evidence that would indicate that they would not have been promoted or hired as an apprentice if they had so requested and in fact, the situations involving June Goldbery and Doris Holmes would indicate the opposite. In their brief, plaintiffs point to Jewel's policy of promoting from within as evidence of general policies of discrimination, arguing that Jewel didn't follow the policy because it did not offer wrappers positions as apprentices. This court does not find this argument persuasive for a couple of reasons. First, there is no evidence that the policy itself is discriminatory. And second, there is no evidence that Jewel applied this policy in a discriminatory manner. The plaintiffs did not present any evidence that Jewel promoted males to meat cutter positions and not females nor that males' requests for promotion were handled any differently than female requests. In fact, the evidence discloses that plaintiffs requested and were given promotions and in some instances were offered promotions by Jewel just the same as some male employees requested or were offered promotions. Accordingly, the plaintiffs have not shown the application element of a prima facie case with respect to their promotion claims.

▮ The plaintiffs have also failed to show a prima facie case of discriminatory transfer in this case. Although there is evidence that the plaintiffs were transferred to different stores at various times, they have not claimed that those transfers were discriminatory. In addition, one of the plaintiffs, Juanita Coffman, testified that she had requested a transfer but the request was denied because there was not a position available at the requested store but she does not claim that Jewel's denial was discriminatory. Rather, the plaintiffs' claims of discriminatory transfer are apparently based on Jewel's failure to transfer them when they were laid off in December 1980.

The plaintiffs maintain that Jewel's failure to transfer them in December 1980 was discriminatory because Jewel had transferred some meat cutters from the Chicago area to the Northwest area of Indiana that otherwise would have been laid off absent a transfer some time before 1980. The evidence reveals, however, that there were no positions available at the time the plaintiffs were laid off in December 1980 to which they could be transferred whereas there were positions available for the meat cutters at the time they were transferred. The Collective Bargaining Agreement between the Union and Jewel provided that there could be no in-classification transfers of employees from one seniority area to another, i.e. Indiana to Illinois, when there were employees on layoff status in the particular classification in the area to which the employee is sought to be transferred. Jewel had already experienced layoffs in some areas and was preparing for further layoffs. The plaintiffs have not identified any available positions to which they would have been transferred and ac-

---

17. Plaintiffs' desires to become meat cutters after the December 1980 layoffs is even questionable since they requested reinstatement to wrapper positions at the EEOC and declined offers to become apprentices in October 1982.

cordingly have failed to show a prima facie case of discriminatory transfer.

■ The plaintiffs, particularly Patricia Babrocky, also maintained that they were discriminated against when they lost their seniority when they were transferred from one job classification to another. Under the Collective Bargaining Agreement, both men and women who transferred to different classifications lost their seniority so there is no basis upon which to infer that plaintiffs were discriminated against with respect to this issue.

■ However, even assuming that plaintiffs have somehow shown prima facie cases of discriminatory recruitment, hiring, transfer and promotion practices, Jewel has articulated legitimate, nondiscriminatory reasons for its employment decisions with respect to these practices and these plaintiffs. No females, including these plaintiffs, ever applied for, expressed an interest in, or requested a promotion to the position of meat cutter at Jewel stores in the Northwest area of Indiana. Title VII does not require an employer to try and guess what position an individual may be interested in and act on that mere speculation to avoid liability under Title VII. Thus, Jewel has met its burden of production under the *McDonnell Douglas* analysis and the burden shifted back to the plaintiffs to show that Jewel's reason was merely a pretext for discrimination which requires a focus on the specific reason given by the defendant. The plaintiffs have not shown that Jewel's reason had no basis in fact or was not a motivating factor in its employment decisions. The plaintiffs maintain, however, that the overwhelming statistical evidence of sex segregated job classifications in the Meat Market renders Jewel's explanations for its employment decisions inadequate to avoid Title VII liability.

In its earlier opinion in this case, the Seventh Circuit held that the district court was incorrect in its treatment of the statistical evidence presented by plaintiffs in this case, *Babrocky*, 773 F.2d at 867–68, and that the overwhelming disparity between the job category of wrappers and meat cutters with respect to the sex of the indi-

viduals in the two categories presented a prima facie case of discriminatory treatment. Id. at 867 n. 7. The Seventh Circuit further noted, however, that reference to the workpool from which Jewel hired would be helpful and might be necessary if the defendants introduced evidence giving a legitimate explanation for the disparity. *Id.*

■ There is no doubt that the Supreme Court of the United States as well as the Seventh Circuit Court of Appeals have acknowledged that statistical evidence can be useful in proving a discrimination claim. *See e.g., International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *United States v. United Brotherhood of Carpenters and Joiners of America, Local 169*, 457 F.2d 210, 214 (7th Cir.1972). However, a mere statistical imbalance in itself does not constitute a discriminatory practice under Title VII. 42 U.S.C. § 2000e-2(j); *see Local 28 of Sheet Metal Workers' International Ass'n v. E.E.O.C.*, — U.S. —, 106 S.Ct. 3019, 3043, 92 L.Ed.2d 344 (1986). Thus, it is clear that plaintiffs need more than just their statistical evidence to prove Title VII claims against Jewel, particularly in light of the fact that Jewel has articulated a legitimate explanation for the disparity. The plaintiffs have failed to produce such evidence and the court therefore finds that the plaintiffs have failed to prove any Title VII claims against Jewel with respect to sex segregated job classifications, or its recruitment, hiring, transfer or promotion policies.

This court's finding that plaintiffs failed to prove their disparate treatment claims against Jewel with respect to sex segregated job classifications and discriminatory recruitment, hiring, transfer and promotion practices requires the same finding with respect to the Union on its Title VII liability on those claims as well. Furthermore, the uncontroverted evidence in this case clearly exonerated the Union from any responsibility for participation in, or nexus to these claims of plaintiffs.

■ The Union had no role in Jewel's recruitment or hiring practices. Al-

though the Collective Bargaining Agreements provided that the Union would refer qualified men or persons on request, the uncontroverted evidence is that Jewel never requested and the Union never referred anyone to Jewel for any position.[18] The uncontroverted evidence also reveals that the Union had no role in Jewel's transfer or promotion policies, practices, or decisions. Accordingly, there is no basis whatsoever in this record upon which to find the Union liable under Title VII for plaintiffs' claims of discriminatory hiring, ̄ recruitment, transfer or promotion.

Nor can the Union be held liable for a failure to vigorously protest the maintenance of sex segregated job classifications at Jewel. As noted above, the sex segregated job classifications at Jewel did not violate Title VII because they were not the result of any discriminatory actions on the part of Jewel. Furthermore, none of the plaintiffs ever complained to or filed a grievance with the Union related to this issue before they were laid off in December 1980. The plaintiffs have not shown that Jewel's hiring, recruitment, transfer or promotion practices, policies or decisions violated any of the Collective Bargaining Agreements between Jewel and the Union nor that the Union handled any complaint or grievance related thereto or to the sex segregated job classifications in a discriminatory manner since they never received such a complaint or grievance from plaintiffs. Accordingly, the plaintiffs have failed to prove any Title VII liability on the part of the Union for sex segregated job classifications or for discriminatory breach of its duty of fair representation with respect thereto.

### B.

### *Discriminatory Layoff or Discharge Claims*

The facts disclose that all of the plaintiffs were laid off by Jewel in December 1980 for economic reasons in the context of a reduction in force. In a reduction in force situation, the elements of a prima facie case require plaintiffs to prove (1) that they are members of a protected class; (2) that they were adversely affected, i.e. laid off; (3) that they were qualified to assume another position at the time of the adverse employment decision; and (4) the employer filled the job by selecting a person outside the protected class or by producing circumstantial or direct evidence from which a fact finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue. *See, e.g., Dorsch v. L.B. Foster Co.,* 782 F.2d 1421, 1424 (7th Cir.1986). However, the court must also be flexible in applying these elements to the facts presented in a particular case.

Plaintiffs have shown that they were members of a protected class and were laid off by Jewel in December 1980. They have not presented evidence of the other two elements necessary to show a prima facie case of discriminatory layoff or discharge. However, the evidence in this case reveals that six wrappers, all female, were laid off whereas no meat cutters, who were all male, were laid off. The court finds that this fact is sufficient to raise a rebuttable presumption that Jewel discriminated against plaintiffs in their layoff. The burden therefore shifted to Jewel to articulate a legitimate, nondiscriminatory reason for its employment decision which it has done. Jewel's articulated reason was that meat cutters have more flexibility in which duties they can perform in the Meat Market under the Collective Bargaining Agreement and Jewel determined that such flexibility was necessary to the operation of its Meat Markets at that time. The burden then shifted back to plaintiffs to show that Jewel's proffered reason was merely a pretext for discrimination.

---

**18.** The plaintiffs have argued that the use of "men" in the Collective Bargaining Agreement with respect to the referral provision is evidence of discriminatory intent. This court finds this argument unpersuasive. Masculine nouns and pronouns are used in many instances when no discriminatory motive or intent is inferred. The Pattern Jury Instructions for the Seventh Circuit are a good example.

The plaintiffs do not dispute that Jewel's reason has a basis in fact and could not make such an argument in light of the record in this case since the terms of the Collective Bargaining Agreements as well as the testimony of the witnesses in this case reveal that meat cutters did have more flexibility in the Meat Market than did meat wrappers. The plaintiffs must therefore show that Jewel was more likely motivated by a discriminatory reason.[19]

■ In their brief, the plaintiffs make two basic arguments in support of their discriminatory layoff claim. First, the plaintiffs argue that "the fact remains that the impact of the sex segregated job categories maintained by Jewel caused the layoff of the plaintiffs since they would not have been laid off had a sex-neutral system of job classification and promotion been in effect prior to 1980." As noted above, the plaintiffs have failed to prove their Title VII claims of instituting and maintaining discriminatory sex segregated job classifications, and discriminatory hiring, recruitment, transfer and promotion policies or practices. Accordingly, their "impact" argument is without foundation. The plaintiffs' second argument is based on the fact that prior to 1980 six journeymen meat cutters who were to be laid off were transferred from the Chicago Heights area to the Northwest area of Indiana to avoid being laid off whereas the plaintiffs were not transferred. Again, as noted above, there were no positions available to transfer the plaintiffs to at the time of their layoff so this is not probative evidence that Jewel was more likely motivated by a discriminatory motive in its decision to lay off plaintiffs. Accordingly, the plaintiffs have failed to prove that Jewel discriminated against them on the basis of their sex with regard to their layoffs.

■ This court's finding that plaintiffs failed to prove their disparate treatment claims of discriminatory layoff and discharge against Jewel requires the same finding with respect to the Union on its Title VII liability on those claims. Furthermore, the evidence in this case reveals that the Union had no role in determining which individuals were to be laid off in December 1980.

Under the terms of the Collective Bargaining Agreement, the Union was to review the information supplied to it by Jewel to be sure a layoff was economically justified and the Union did so with respect to the December 1980 layoff of the plaintiffs. Beyond that review, the Union had no say so in which employees were to be laid off nor in Jewel's decision to lay off 6 wrappers instead of the originally proposed 3 wrappers and 2 apprentices. Thus, contrary to the Seventh Circuit's assumption in its earlier opinion in this case, the Union did not persuade Jewel to change its decision from 3 wrappers and 2 apprentices to 6 wrappers. *See Babrocky*, 773 F.2d at 869.

■ Nor can the Union be held liable under Title VII for a discriminatory breach of its duty of fair representation. According to the Seventh Circuit's earlier opinion in this case:

> Establishing a prima facie Title VII claim against the Union based on a breach of a duty of fair representation requires the plaintiffs to show that (1) Jewel violated the collective bargaining agreement with respect to the plaintiffs, (2) the Union permitted the breach to go unrepaired, thus breaching its own duty of fair representation, and (3) there was some indication that the Union's actions were motivated by discriminatory animus. *Bugg v. International Union of Allied Industrial Workers of America, Local 507*, 674 F.2d 595, 598 n. 5 (7th Cir.1982, certiorari denied, 459 U.S. 805, 103 S.Ct. 29, 74 L.Ed.2d 43 (1982)).

773 F.2d at 868. The plaintiffs did not meet their burden under this test. First,

---

**19.** In its earlier opinion in this case, the Seventh Circuit noted that Jewel's and the Union's possible use of an allegedly newly adopted 1:4 hiring ratio of meat wrappers to meat cutters may have been a pretext for laying off only women employees in this case. *Babrocky*, 773 F.2d at 865. The evidence reveals that no such ratio applied to the Jewel stores in which plaintiffs were employed so such a ratio could not be used to show pretext.

the plaintiffs have not shown that Jewel breached the Collective Bargaining Agreement with respect to their layoffs. The Collective Bargaining Agreement, which is neutral on its face with respect to seniority and has not been shown to be discriminatorily applied, required that layoffs be done by seniority within a classification and that was done in the case. Second, since there was no breach of the contract, the Union's decision not to process the grievances was a correct one, made in good faith on the basis of the contract language. And third, the evidence in this case does not indicate that the Union's actions were motivated by a discriminatory animus. The Union frequently handled grievances for its female members and did so in the same manner that it handled grievances from its male members. The Union's handling of Ms. Keene's grievance relating to her January 1980 layoff is such an example. Accordingly, the plaintiffs have failed to prove that the Union has any Title VII liability with respect to their layoff and discharge claims.

## C.

### Unequal Pay Claims

Title VII makes it an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a). However, Title VII was amended to add section 703(h), 42 U.S.C. § 2000e–2(h), which provides as follows:

It shall not be an unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid to employees of such employer if such differentiation is authorized by the provisions of [The Equal Pay Act, 29 U.S.C. § 206(d)].

The Equal Pay Act, 29 U.S.C. § 206(d)(1) provides in part:

No employer ... shall discriminate ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of productions; or (iv) a differential based on any other factor than sex....

In *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the Supreme Court of the United States addressed the interplay between § 703(h) of Title VII and the Equal Pay Act in the context of deciding whether a plaintiff who fails to satisfy the equal work standard of the Equal Pay Act in itself precludes a plaintiff from proceeding under Title VII. Upon analyzing the language of the statutes, legislative history and purpose of Title VII, the Court concluded that "only differentials attributable to the four affirmative defenses of the Equal Pay Act are "authorized" by that Act within the meaning of § 703(h) of Title VII", *id.* at 171, 101 S.Ct. at 2249, and therefore found that a plaintiff may state a claim of sex-based discrimination in compensation under Title VII without proving that he or she was performing a job substantially equal to that held by a higher paid member of the opposite sex. *Id.* at 181, 101 S.Ct. at 2253–54. Thus, under *Gunther*, a plaintiff can assert a Title VII claim of unequal compensation for different pay for substantially equal work or on evidence showing that an employer has intentionally paid a female less because she is female or granted or denied benefits based on sex. *See Jennings v. Tinley Park Community Consolidated School District No. 146*, 796 F.2d 962 (7th Cir.1986); *American Nurses' Ass'n v. State of Illinois*, 783 F.2d 716 (7th Cir.1986); *Boyd v. Madison County Mutual Ins. Co.*, 653 F.2d 1173 (7th Cir.1981). Further, in analyzing an unequal compensation claim under Title VII, a court may follow the method of proof set forth in *McDonnell Douglas* to determine if an employer has intentionally discriminated

against plaintiffs. *See Jennings, supra; Boyd, supra.*

In their complaint, plaintiffs alleged that Jewel and the Union engaged in unlawful employment practices and policies in violation of 42 U.S.C. § 2000e which included "[f]ailing and refusing to pay females on an equal basis with men for substantially equal work." In their post-trial memorandum the plaintiffs maintain that they have established liability on the part of Jewel for unequal pay "since wrappers often performed the same work as journeymen or apprentice meat cutters but never received the same rate of pay" and that such "was evident as to the plaintiffs who managed Sausage Shoppes and received wrapper pay, while their male counterparts who were journeymen received journeyman pay." Based on these assertions it appears that plaintiffs' claim of unequal compensation are based on unequal pay for equal work under Title VII since they have not alleged any claims under the Equal Pay Act.

 The evidence in this case discloses that Patricia Babrocky received less wages than the journeyman she replaced as Manager of a Sausage Shoppe at Jewel's store in River Oaks and that both she and the journeyman performed the same managerial duties. Thus, Ms. Babrocky has shown a prima facie case of unequal pay. However, Ms. Babrocky ceased being a Sausage Shoppe Manager December 31, 1977, did not file her EEOC charges until January 1981 and did not file the complaint in this case until July 17, 1981. Thus, Ms. Babrocky did not comply with the time limitations contained in Title VII. Further, there is no evidence of a continuing violation in this case [20] nor has Ms. Babrocky asserted or presented evidence upon which the court could infer that equitable tolling should be applied in this case. Accordingly, there is no basis for any relief in this case for Ms. Babrocky based on the pay differential for Managers of Sausage Shoppes.

 The plaintiffs have also presented evidence that at times apprentice and journeyman meat cutters performed wrapper work but were paid meat cutter wages which were generally higher than wrapper wages. Assuming this evidence is sufficient to show a prima facie case of discrimination [21], Jewel has articulated a legitimate, nondiscriminatory reason for the pay differential and shown that the differential is based on a factor other than sex. Apprentice and journeymen meat cutters were skilled employees, had to complete a training period in which they learned the meat cutting business including how to cut meat and operate certain machinery and were available to and did perform other tasks and duties that wrappers, as basically unskilled employees compared to meat cutters, were not permitted to perform. Thus, the difference in pay between meat cutters and wrappers was grounded on different job duties, responsibilities and skills. Furthermore, the difference between these skilled and unskilled job classifications is recognized by Retail Meat Markets in the area as evidenced by the wage scales contained in the various collective bargaining agreements applicable to the grocery store chains. Thus, Jewel's reliance on industry wide standards of market wages for the different classifications is not evidence of any discriminatory intent on the part of Jewel. *See American Nurses Ass'n v. State of Illinois,* 783 F.2d at 722. Accordingly, Jewel has shown that

---

**20.** In fact, the evidence reveals that Jewel phased out its Sausage Shoppes in 1978 and that Chef's Kitchens, which were the successor to the Sausage Shoppes, were not part of the Meat Market and thus were not controlled by the same Collective Bargaining Agreement.

**21.** The plaintiffs testified that they helped train new apprentices at times but that the wages paid were not the same. The Collective Bargaining Agreements indicate that new apprentices received less wages than wrappers who had been on the job for awhile so the court does not find that this evidence is probative of any discriminatory intent with respect to unequal pay. Further, the plaintiffs testified that two journeymen, Carl and Eugene Forbes, did a lot of wrapper work but were paid journeymen wages. However, the evidence reveals that the time frame in which this occurred was in the early to mid-1970's so it would be outside the appropriate time frame.

the pay differential is based on a factor other than sex and plaintiffs have failed to prove that Jewel discriminated against them with respect to their wages.

■■■ Likewise, the plaintiffs have failed to prove their unequal pay claim against the Union for the same reasons.[22] In addition, the evidence reveals that none of the plaintiffs or anyone else ever filed a complaint or grievance with the Union relating to unequal pay or to employees doing work outside their classification. Accordingly, there is no basis for any Title VII liability on the part of the Union for any claim for discriminatory breach of a duty of fair representation related to plaintiffs' unequal pay claim.[23]

### III.

For all of the foregoing reasons, plaintiffs have failed to prove that they are entitled to any relief under Title VII against Jewel or the Union in this case. Accordingly, judgment shall be entered in favor of Jewel and the Union and against all plaintiffs in this case. Each side shall bear its own costs. SO ORDERED.

---

**22.** The plaintiffs have not asserted nor presented any evidence to support a claim of discrimination for unequal pay for unequal work. In other words, they have not presented a case based on comparable worth. *Cf. American Nurses Ass'n v. State of Illinois,* 783 F.2d 716 (7th Cir.1986). Nor, have the plaintiffs alleged that the job classifications or wage structures contained in the collective bargaining agreements were discriminatory on their face or were negotiated with any discriminatory intent.

**23.** Subsequent to their layoff, some of the plaintiffs complained to the Union about journeymen and apprentice meat cutters, as well as part-time wrappers, doing their work and claiming that such action was a violation of the Collective Bargaining Agreements. The evidence reveals, however, that no part-time wrappers were hired by Jewel until after the plaintiffs' recall rights had expired and that journeymen and apprentices could do wrapper work without violating the collective bargaining agreement.